ROBERT I. DIEFENDERFER, Jr.,
*Plaintiff and Appellant*

vs.

ROBERT L. TOTMAN, IRENE TOTMAN, BIG HORN BROADCASTING COMPANY a corporation, and DON E. TANNEHILL,
*Defendants and Respondents.*

(No. 2649; March 1, 1955; 280 Pac. (2d) 284)

410

For the plaintiff and appellant the cause was submitted upon the brief and also oral argument of R. G. Diefenderfer of Sheridan, Wyoming.

For the defendants and respondents the cause was submitted upon the brief and also oral argument of H. Glenn Kinsley and William D. Redle, both of Sheridan, Wyoming.

412

## OPINION

BLUME, Justice.

This is an action brought by plaintiff against the defendants for disparaging plaintiff's goods.

The defendants, Robert L. Totman and Irene Totman, had been merchants in Sheridan, Wyoming for a period of approximately twenty years, having a stock of merchandise which included radios, dishes, glassware, turquoise Indian stones and jewelry, various electrical appliances and instruments other than ra-

dios, Navajo rugs and phonograph hecords and other similar property.

The defendant, Big Horn Broadcasting Company, is a broadcasting company located at Sheridan, Wyoming, and its broadcasts could possibly reach a population of some twenty thousand people in and around the city of Sheridan, Wyoming.

The defendant, Don E. Tannehill, was an agent of the broadcasting company and aided the defendant Robert L. Totman in the broadcast over the radio station as hereinafter mentioned.

On March 16, 1952, a fire occurred in the building occupied by the store of the Totmans. They had insurance on the stock or merchandise and after the fire a salvage company took possession and placed it in another building in the city of Sheridan, Wyoming, and offered it for sale in bulk. The plaintiff herein bought that stock in bulk, except some of the merchandise which had been thrown away and except four pianos, and paid the salvage company the sum of $14,777.77. The plaintiff intended to sell the property bought in bulk at retail in the same building in which the property had been located by the salvage company. On the evening of June 6, 1952, he advertised in the Sheridan Press, a newspaper published at Sheridan, Wyoming, a notice of a fire sale "of the former" Totman Company stock of merchandise. The advertisement was not signed by anyone. On the following morning at 7:45, Robert L. Totman, with the assistance of the defendant Tannehill, made the following oral broadcast over the radio station of the broadcasting company in the following terms, to-wit:

"If you will remember . . . on March 16th, Totmans Shop caught fire. Also you'll remember it was quite a mess. What fire didn't beat to death, water

did. Well, as an outcome, insurance adjusters came in, threw away most of the merchandise . . . and the rest was packaged and sold to the highest bidder. Now if that merchandise had been worth the paper cartons it was packed in, Bob would have bought it back at the reduced price and thus made himself a little of that old mazooma. But after looking it over, the merchandise that is, it looked even worse than he thought it did. Radios had picked up moisture, dishes and glassware, subjected to terrific heat, were brittle, turquoise Indian stones in jewelry were permanently discolored. Appliances, radios and instruments carried no guarantee whatsoever. The Navajo rugs were scorched and the colors ran together. The record stock was wet and useless, since they would warp.

"Now, the salvage corporation sold the merchandise to Bob Diefenderfer of Bob's War Surplus Store. The ad in last night's Sheridan Press lent to the allusion that Bob Totman was selling the merchandise. This is not true. Totmans Frontier Shop has nothing to do with the sale. None of the merchandise sold at the fire sale will carry a guarantee through Totmans Frontier Shop. The buyer buys as is and takes the consequences.

"So, if you're in the market for appliances, jewelry, radios, instruments and late records . . . better hang off for a few more days. Totmans Frontier Shop plans to open about the first of July."

It is this broadcast upon which the action for disparagement of property is based. Plaintiff alleged in his petition that by inference the broadcast charged the plaintiff with fraud and deception in offering a worthless stock of merchandise for sale; that the broadcast was false and defamatory and was mali-

ciously intended and designed to damage and injure the plaintiff in selling the salvaged property which he bought; that the property bought by him was worth the sum of $56,800; that by reason of the broadcast his sales declined by the sum of approximately $300 per day and the value of the property was reduced to the sum of $30,000 and damaged the plaintiff in the sum of $26,800. Judgment for $25,000 general damages was prayed for by the plaintiff.

The defendants herein filed separate answers which, however, were substantially alike. In them was alleged the fact that by the advertisement by plaintiff in the Sheridan Press on the evening of June 6, 1952, the plaintiff had led the public to believe that the Totmans either had discontinued their business or that they were in some way interested in the fire sale stock; that the Totmans had not discontinued business but would reopen with a new stock about July 1, 1952; that the broadcast was made necessary by the false and misleading advertisement by the plaintiff with respect to the fire sale; that it was made in good faith to advise the public of the true facts; that it contained no false statements; that it was made without malice; that it was read in less than two minutes' time. Defendants further denied that the plaintiff was damaged in any way.

The case was tried to the court without a jury and the court, after making a finding of facts, reached its conclusions of law as follows:

"(1)   That the radio broadcast of June 7, 1952, of which the Plaintiff complains herein and which is set forth in Plaintiff's Petition was made and published by the Defendants in good faith and for justifiable purpose and without malice on the part of the Defendants or either of them.

"(2)   That the statements made in said announcement were true except for the word 'now if that merchandise had been worth the paper cartons it was packed in', which words were uttered argumentatively. That the evidence herein fails to show wherein the Plaintiff suffered any damage through the broadcast of said statements contained in said broadcast.

"(3)   That the evidence offered by the Plaintiff respecting alleged loss of profits is not sufficient to warrant an award of damages by this Court. That any and all damages claimed by the Plaintiff herein, the Court finds are uncertain, conjectural and speculative, and the Court finds that no damages have been established or proven and that no award of damages should be made to the Plaintiff herein.

"(4)   The Court finds upon all issues of law and fact herein generally against the Plaintiff and for the Defendants; that the prayer of the Plaintiff's Petition should be denied and his Petition dismissed, and that the Defendants should have and recover judgment against the Plaintiff for all their costs herein."

The court accordingly ordered that the prayer of the plaintiff's petition be denied and should be dismissed at plaintiff's cost. From that judgment of the trial court, the plaintiff has appealed to this court.

Counsel for the plaintiff has furnished us with an excellent dissertation on the development of the law of disparagment of goods or property, which we have read with considerable interest. No case, however, similar to the facts in this case has been cited to us, so that we think we should content ourselves with stating some of the salient features of the law relating to the subject before us. A fairly good discus

sion is contained in Newell, Slander and Libel, 4th Ed., particularly in § 169. All authorities seem to be agreed that words in disparagement of another's goods or property are not slanderous per se, but that special damages must be shown. 53 C.J.S. 391. In 33 Am. Jur. § 348, p. 313, it is stated that malice, express or implied, is an essential element in actions for disparagement of goods. But at the end of that section it is stated: "Under the rule adopted by the American Law Institute, liability may be incurred by the publication of an untrue statement in disparagement of another's property or title under such circumstances as would lead a reasonable man to foresee that a sale or lease of the property would thereby be prevented, regardless of the publisher's motive, intent, or good faith." That seems to be borne out by §§ 625, 629, Restatement of the Law of Torts. In that restatement in § 624, the general rule is said to be as follows: "One who, without a privilege to do so, publishes matter which is untrue and disparaging to another's property in land, chattels or intangible things under such circumstances as would lead a reasonable man to foresee that the conduct of a third person as purchaser or lessee thereof might be determined thereby is liable for pecuniary loss resulting to the other from the impairment of vendibility thus caused."

The broadcast of which the plaintiff complains states facts and contains expressions of opinion based thereon. Thus it is stated that the records were wet and hence would warp and would be useless. In § 627, Restatement of the Law Torts, it is stated that if one without privilege publishes an opinion which disparages another's goods, he is subject to an action for disparagement if, and only if, the publisher does not hold the opinion which he expresses. In view of the testimony in this case, it can hardly be said that the defen-

dants did not hold the opinions which they expressed. But were they privileged? That point, to some extent at least, is dealt with in § 648, Restatement of the Law of Torts, where it is stated that one is privileged if he reasonably believes that the publication of the disparaging matter to the recipient is necessary for the latter's or a third person's protection. There can of course, be no doubt that Totman acted in the main for his own protection; he doubtless believed that he would lose customers when he would reopen his store with a new stock of merchandise on or about July 1, 1952. Still the question remains: Had he any right, under the circumstances herein, to attempt to dissuade such prospective customers or others from buying plaintiff's goods, particularly in view of the fact that the advertisement of plaintiff on June 6, 1952, mentioned no name, causing, perhaps, purchasers to believe that Totmans were the sellers? In some instances at least the interest of the publisher may be considered. 3 Restatement of Torts, p. 240. In 53 C.J.S. 396, 397, it is stated: "A communication disparaging another's title or property is qualifiedly privileged if the publication was honestly made by defendant, believing it to be true, and there was a reasonable occasion or exigency in the conduct of his own affairs in matters where his interest was concerned, which fairly warranted the publication." The point here discussed is of some interest, but it would seem to be advisable not to decide it unless necessary. We do not think it is.

The main, or one of the main, contentions of defendants herein is that the plaintiff did not show that he sustained any loss by reason of the broadcast in question, which took only a minute and ahalf to read. So we shall proceed to examine that phase of the case, and it will not be necessary to definitely decide any other question, if that contention is correct. All the author

ities seem to agree that it is necessary to show damages in order to prevail in an action such as before us. See 3 Restatement of the Law of Torts, p. 323. Counsel for plaintiff seems to contend in his brief that the testimony shows without conflict that the plaintiff was damaged. We cannot agree with that contention. We shall review the testimony briefly, but before doing so, we might incidentally state the rule in 25 C.J.S. § 42, pp. 518, 519, which, on its face, seems to come close to being applicable herein, as follows:

> "As a general rule the expected profits of a commercial business are too uncertain, speculative, and remote, to permit a recovery for their loss. However, the loss of profits from the destruction of interruption of an established business may be recovered for if the amount of actual loss is rendered reasonably certain by competent proof; but in all such cases it must be made to appear that the business which is claimed to have been interrupted was an established one, that it had been successfully conducted for such a length of time, and had such a trade established, that the profits thereof are reasonably ascertainable. Where an article essential to the conduct of a business has been destroyed, there can be no recovery of profits lost in the business during the time necessary for the replacement of the article.
>
> "Where a new business or enterprise is floated and damages by way of profit are claimed for its interruption or prevention, they will be denied for the reason that such business is an adventure, as distinguished from an established business, and its profits are speculative and remote, existing only in anticipation."

Plaintiff claims that he was damaged to the extent of $25,000 or more. That is based on his testimony that

80% of the stock which he bought was in good condition, and that the value of the stock bought by him was $56,800. His father, a merchant for many years, valued the stock at $60,000. Plaintiff paid the sum of $14,777.77, so that he marked up the stock some 300%. That on its face appears to be a rather high profit, though, of course, there is nothing to prevent a man from claiming, and making, a good bargain of that proportion, if the facts warrant it. What are the facts? Totman valued his fixtures, before the fire at $7,200, and his stock, before the fire, at about $62,800, a total of $70,000. Four pianos of the value of, say about, $3,000 were included in Totman's stock, but were not purchased by the plaintiff. Hence plaintiff valued the stock purchased by him at nearly the amount at which it was valued before the fire, and that without reference to the damage inflicted upon it by fire and water, and without reference to the merchandise which became worthless and was thrown away and was not turned over to the plaintiff. The testimony shows that two different fire hoses poured water into the building in which the Totman stock was located and upon the stock of merchandise for a period of more than four hours. The heat in the building became intense, necessarily scorching much of the merchandise and causing much of the glassware, for instance, to become brittle. One needs but to read Totman's graphic description of the oceanic deluge of the water poured upon the merchandise and the holocaust wrought by the ever advancing, ever licking and consuming flames to make one pause and wonder whether the claim that 80% of the merchandise remained in good condition is based on fact or whether the use of the adjective "good" shows merely the diversity of perception by eye and mind stemming from the diversity of human self-interest. The witness Powers stated that nearly every

piece of merchandise was damaged and that a couple of truckloads of rubble and rubbish were thrown out on the sidewalk. The witness Helsberg testified that everything was in a jumbled mess and that it was hard to find anything that would look like it would be worth anything. The witness Florence Estes stated that everything she saw was damaged; "there would be very little in the stock I would have cared to purchase * * * in my mind the damage was very extensive." The witness Toler stated that the glassware had been exposed to terrific heat and was cracked and shattered; that the leather goods were thoroughly water-soaked and blistered and had begun to curl; that the edges of the Navajo rugs were scorched; that the stones were discolored. Mrs. Totman stated that the condition of the merchandise was terrible; that she could not see anything that was not injured. The witness Greenhalgh, a jeweler, testified that he wouldn't give a dime for the stock when he saw it. The witness J. W. Sampson, an insurance adjuster, stated that all the merchandise except a small amount was badly damaged; that none of it was in perfect condition, that a lot of it was burned, or smoked or water-soaked; that it seemed to him that there was a total loss. The witness Diers testified that the merchandise in the basement, when taken out, looked more like muck than anything by the time it was loaded.

It is said in 33 Am. Jur. § 350, pp. 314, 315, that "where the loss of sale of a thing disparaged is claimed and relied on as special damages occasioned by the disparagement, it is necessary to show a loss of sale to some particular person." There is authority to the contrary, if, it seems, a general loss of sales can be shown. Erick Bowman Rem. Co. v. Jensen Salsbery Lab., 17 F.2d 255, 52 A.L.R. 1187, and authorities cited. Plaintiff claims such general loss of sales. His father

testified that he noticed "sales resistance" after the broadcast. "Q. What, if anything, did you hear? A. Well, I encountered a resistance to them (customers) buying. They'd say, 'Well, we're afraid of this;' 'Those records might not be any good;' 'the jewelry stones are colored; they are not the right color.' The same way with glassware, it would be 'brittle'; the dishes would be 'brittle'." We hardly think this testimony was of any importance. Presumably the people in Sheridan knew of the fire; the sale by plaintiff was advertised as a "fire sale". The remarks mentioned were, it would seem, but the natural remarks which people would make in connection with goods offered at a fire sale.

Plaintiff claims that as a result of the broadcast above mentioned his sales were reduced by $300 per day. That is based on the fact that his sales on the opening day of his store amounted to $551.17, while the following day's sales were reduced to $292.16. It would seem the court had the right to conclude that if the broadcast did any damage, it would do so on the first day. Totman testified that if a day's sales of merchandise, such as involved herein, amounted to $400 or $500, it would be a good day's sales. Hence the court had the right to conclude that the first day's sales were not diminished by reason of the broadcast in question. The day following the second day, plaintiff's sales amounted to $582.37; on June 23, they were $302.14; on June 25, they were $472.17; on June 28, $421.93. Later on in the year a day's sales amounted to $584.70, and two auction sales amounted to $732.16 and $566.69, respectively. We are not able to see how, in the face of this testimony, the trial court was wrong in ruling against plaintiff's contention.

Totman testified that the salvage value of a stock of merchandise which has been damaged by fire is on the average 25 % of its value. We presume that is the

value of the merchandise in bulk, to which, if sold at retail, should be added a certain percentage. The testimony of plaintiff shows that the markup of a retailer is 33 to 50%. Totman testifed that it is 35 to 40%. We are not prepared to say that the trial court did not have the right to consider that a fair way of valuation and to apply that percentage when determining the value of the stock of merchandise bought by the plaintiff. The latter paid $14,777.77. He sold 85 % of the merchandise bought by him at retail, as his own testimony shows, for about $32,000, which is about 117% over and above what he paid, instead of 33 to 50%. Plaintiff stated that his operating cost was $9,437, which together with what he paid makes $24,214.77, leaving him a net profit on 85% of the merchandise of approximately $7,785, and made in a little more than six months, plaintiff closing his store on December 15, 1952. and he than had 15% of the property left.

We should be at a total loss to know what directions to give to the trial court, if we were to reverse the case. The question of the amount of damages, if any, sustained by the plaintiff, was a question of fact, and was, in case of conflict in the evidence, as in this case, in the province of the jury, or the trial court, when the case was tried without a jury. 25 C.J.S. 860. We think the judgment of the trial court that the plaintiff was not in any way damaged by the broadcast here in question is sustained by substantial evidence. The judgment herein must be and is accordingly affirmed.

*Affirmed.*

RINER, C. J., AND HARNSBERGER, J., concur.