Phil BRENNAN and Eileen Brennan, Appellants (Plaintiffs below),

v.

LARAMIE NEWSPAPERS, INC. and David J. Mickelson, Appellees (Defendants below).

No. 3994.

Supreme Court of Wyoming.

Feb. 15, 1972.

2. City of Casper v. Wagner, 74 Wyo. 115, 284 P.2d 409.

Weston W. Reeves, of Graves, Smyth & Reeves, Cheyenne, for appellants.

Alfred M. Pence, of Pence & Millett, Laramie, for appellee Laramie Newspapers, Inc.

Thomas S. Smith, of Smith, Stanfield & Mendicino, Laramie, for appellee David J. Mickelson.

Before McINTYRE, C. J., and PARKER and McEWAN, JJ.

Mr. Justice McEWAN delivered the opinion of the court.

The plaintiffs filed a complaint alleging that defendant-Laramie Newspapers, Inc. had published a defamatory article of and concerning plaintiffs, and also alleging that defendant-Mickelson had slandered plaintiffs in the same manner. The cause was tried before a jury, and at the close of plaintiffs' case the trial court granted defendants' motions for directed verdicts.

This case arose as a result of a picture and story in the Laramie Daily Boomerang on April 30, 1970, which paper was published by the defendant-Laramie Newspapers, Inc. The picture showed defendant-Mickelson holding a quart bottle of water. Under the picture was the following story:

"POLLUTION ISN'T ALL ABOVE GROUND, as Dave Mickelson, resident of the Snowy Range Trailer Estates in West Laramie, has found. Mickelson glares unhappily at a quart sample of water taken from the faucet of his trailer home. He had the unsavory sample tested by the University of Wyoming and was told that the water was polluted and contained a heavy measurement of solids and was not fit for human consumption. Mickelson, a UW student, said, 'It doesn't really matter now—I'm moving tomorrow.' The water comes from a privately-owned well and is not a part of the city water system, but complaints of contaminated wells have not been uncommon in West Laramie."

Plaintiffs owned and operated the "Snowy Range Trailer Estates." When they purchased the first piece of property in 1962 the improvements consisted of a house containing an apartment. In 1963 they began to operate a public trailer park using the name "Snowy Range Trailer Estates." In 1965 they purchased a tract of undeveloped land diagonally across from the original property, and this is the tract upon which defendant-Mickelson's trailer was parked. They developed the park until they had 14 trailer spaces in the original area, four on the lands acquired in 1965, and plans for further expansion. At the time the newspaper article was published there were also in the trailer park three trailers and two houses with apartments, all owned by plaintiffs and used as rentals. They preferred to rent to students, and most of the tenants attended the University of Wyoming. Each section had its separate water system for residential use by tenants consisting of two wells in each section, one of which was referred to as a shallow well and one as a deep well. The two wells in the section in which defendant-Mickelson lived were not interconnected and could not be used simultaneously for domestic purposes but were used alternately, as later discussed.

Mr. James Hull, general manager of Laramie Newspapers, Inc., was called as an adverse witness by plaintiffs. He wrote the caption which appeared under the picture of defendant-Mickelson and the jar of water. Mr. Hull had known defendant-Mickelson for about two years and first met him while defendant-Mickelson was employed at the Laramie Country Club. On or about August 24, Mr. Hull had gone to defendant-Mickelson's trailer to pick up his wallet which he had lost and which defendant-Mickelson had found. While there Mr. Hull observed water drawn from the tap in defendant-Mickelson's trailer. He testified that the water appeared "very bad," it was "murky, discolored," but it was not as discolored as the water pictured in the newspaper article.

Defendant-Mickelson moved into the trailer park with his own trailer in July of 1969, and stayed there until April 30, 1970. He answered an ad in the paper placed by the Brennans in which it was said they would give free rent to anyone willing to work five hours per week. He worked "full time" for the Brennans in July, August, and the first part of September, and a few hours each month through December. Mr. Brennan was a salesman and was out of town quite a bit and Mrs. Brennan needed someone to take care of emergencies. Mr. Brennan was out of town when defendant-Mickelson moved in and apparently he did not return until sometime in September. From time to time there were problems of rust in the water. Mrs. Brennan testified that defendant-Mickelson had helped her in attempts to cure the rust problem, and in September of 1969 she had him turn off the deep well because they couldn't get rid of the rust. There appeared to be no animosity between plaintiffs-Brennans and defendant-Mickelson, and Mrs. Brennan thought he was a "fine gentleman."

The Brennans had recommended that their tenants carry city water for drinking purposes and furnished defendant-Mickelson and other tenants containers in which to carry water from town. On occasions Mr. Brennan had defendant-Mickelson put Clorox in the wells, but was not sure he had ever had him put Clorox into the shallow well or had done so himself. In any event, the water situation at the Snowy Range Trailer Estates left something to be desired, and plaintiffs agreed it would be in their best interest to have city water.

On April 28 or 29, defendant-Mickelson drew the sample of water which was pictured in the paper. He testified that he took the sample to the University of Wyoming for testing, then showed it to the city sanitarian, and subsequently took it to the Fireside Lounge where he had been working and where Mr. Hull saw it and requested a picture. Defendant-Mickelson

advised Mr. Hull that he had had the water tested and was advised that it was unfit for human consumption. Although there is some confusion in the testimony it appears that at the time defendant-Mickelson drew the water shown in the newspaper picture Mr. Brennan changed the water source from the shallow well to the deep well. He did this to make some changes in a pressure tank. Later the same day he turned off the deep well and reactivated the shallow well. Mr. Brennan testified that when he turned the shallow well back on he " * * * suspected I might have turned up some of this rust * * *. There was some rust in it, wasn't too bad." The record is inconclusive as to whether the water in the picture came from the shallow well or the deep well.

After defendant-Mickelson contacted the city sanitarian, the sanitarian went to the Snowy Range Trailer Estates on five different occasions and took samples of the water, tests of which showed the water to be safe. He took samples on April 28, 1970, and May 6, 13, 20, and 26, 1970, but it was not until May 26 that he took a sample from the same water system from which defendant-Mickelson drew the water pictured in the newspaper. Generally, the water situation in West Laramie was not good. At about the time West Laramie was annexed to the City of Laramie in December of 1967, the city sanitarian, after making several tests, reported his findings to the city manager and recommended that West Laramie be put on city water and sewage.

Plaintiffs argued that they had established a prima facie case that defendant-Laramie Newspapers, Inc. published defamatory matter of and concerning plaintiffs, which matter was false and not protected by any privilege, and, further, they had established a prima facie case that defendant-Mickelson published by oral communication defamatory matter of and concerning plaintiffs, and the trial court erred in granting defendants' motions for directed verdicts. In their brief plaintiffs stated the pretrial order incorporated the issues for trial, one of which—as agreed to by the parties—was the question of plaintiffs' damages. One of defendants' arguments was that the published material, if libelous or slanderous, was a libel or slander upon property and not upon the persons of the plaintiffs, that words in disparagement of property are not slander or libel per se, and that special damages must be shown.

■ An examination of the record convinces us that the alleged defamation was one of property and not upon the persons of plaintiffs. The name Brennan did not appear in connection with any advertising for Snowy Range Trailer Estates. When plaintiffs first began their business of a trailer park in 1962 they used the name Snowy Range Trailer Estates, which name appeared in all advertising, including the yellow pages of the telephone directory and the sign in front of the park. Mrs. Brennan was asked on direct examination, " * * * what groups of people, if any, associate you and Mr. Brennan with Snowy Range Trailer Estates?" and she replied, "Only the ones that would use the telephone directory." However, she had previously testified that the name Brennan did not appear in connection with Snowy Range Trailer Estates in the telephone directory.

Nowhere in the article were the plaintiffs named. The comments in the newspaper article related to property in the form of water at the Snowy Range Trailer Estates.

■ As we said in Diefenderfer v. Totman, 73 Wyo. 409, 280 P.2d 284, 286, " * * * All authorities seem to be agreed that words in disparagement of another's goods or property are not slanderous per se, but that special damages must be shown. [Citation.]" The only evidence as to damages was the testimony of

Mrs. Brennan. She said that because of the publication people moved out, and when that happened they were put to certain expenses in cleaning and repairing damage done by the former tenant before the space could again be rented. She computed the amount of these damages at "A little over $1,000.00." However, upon cross-examination she said she was not aware of the reasons that various tenants moved but she suspected it was due to the water. When asked specifically how she arrived at the $1,000 damages she was unable to account for such sum. She did name some renters who moved after the article appeared, but most of them were students who had either graduated or left school and moved away from Laramie. She was asked if any of the tenants who had moved had told her they had done so because of what they had read in the newspaper and she replied "No." We are, therefore, of the opinion that plaintiffs made no showing of any damages as a result of the newspaper article.

██ We are aware that this court has on many occasions said that in reviewing the granting of a directed verdict[1] consideration will be given to all evidence favorable to the party against whom the motion is directed, together with reasonable and legitimate inference which might be drawn from such evidence. However, no inference can be based upon mere surmise, guess, speculation, or probability. Brasel and Sims Construction Co. v. Neuman Transit Co., Wyo., 378 P.2d 501, 506. Here there was no evidence upon which the jury could have determined what damages, if any, plaintiffs may have suffered, and the trial court was correct in granting the motions for directed verdicts.

Affirmed.

GRAY, J., was a member of this Court when this matter was heard, but he did not participate in the hearing or opinion.

---

1. Our Rule 50(a), W.R.C.P. (Motion for Directed Verdict) is identical to Rule 50(a), Fed. Rules Civ.Proc.