**R. E. B., INC., Plaintiff-Appellee,**

**v.**

**RALSTON PURINA CO.,**
**Defendant-Appellant.**

**No. 74–1895.**

United States Court of Appeals,
Tenth Circuit.

Argued Sept. 3, 1975.

Decided Oct. 21, 1975.

David H. Carmichael, Hanes, Carmichael, Gage & Speight, a Professional Corp., Cheyenne, Wyo., for plaintiff-appellee.

James L. Applegate, Hirst, Applegate & Dray, Cheyenne, Wyo., for defendant-appellant.

Before HILL, BARRETT and DOYLE, Circuit Judges.

DOYLE, Circuit Judge.

The judgment appealed from in this implied warranty action arose under the Wyoming Uniform Commercial Code, Wyo.Stat. §§ 34–2–314, 34–2–315 (Cum. Supp.1973).

The allegations of plaintiff R.E.B., Inc. are that it operated a hog ranch that produced purebred hogs for fattening and breeding purposes; that during the period commencing about August 1, 1970, and continuing to April 1, 1971, Ralston Purina, appellant herein, furnished defective feed to it; that the defective feed injured its animals, whereby some of them died and others were unable to conceive and produce offspring, while others gave birth to stillborn offspring. R.E.B. further claims that its herd thus deteriorated, causing loss of its property in the hogs, loss of pr 'its and loss of good will.

The cause has been before this court previously. *See R.E.B., Inc. v. Ralston Purina,* No. 73–1627 (10th Cir., filed April 17, 1974). In that prior case, in which Ralston Purina was adjudged liable for breach of its implied warranty of fitness for a particular purpose for furnishing defective feed, the trial court had not given any instruction on the issue of damages. Ralston Purina had tendered an instruction which would have told the jury that generally loss of profits of a commercial business are too uncertain, speculative and remote, and are to be allowed only if rendered reasonably certain by positive evidence. Our holding was that the trial court committed error in refusing to give Ralston's instruction or one similar to it, and indeed, in failing to instruct on dam-

ages altogether. We remanded for retrial of the issue of damages only.

On the remand, R.E.B., Inc. was allowed to amend its complaint so as to redefine its damages claims and so as to greatly increase the amount demanded. Following retrial, a verdict was awarded to R.E.B., Inc. in the amount of $262,000. (The original verdict had been substantially less. It had amounted to the sum of $114,773.)

The evidence established that R.E.B., Inc., commenced business in 1963. At that time it acquired 57 Specific Pathogen Free gilts plus two boars. Its object was to develop and sell high quality breeding stock for the purpose of sale to farmers. To accomplish this it used a so-called "closed herd." By means of a process of selection and reselection it was able to develop a herd of 210 high quality sows by July 1970.

The defective feed furnished to it by Ralston was the cause of the injuries to the sows and offspring described above. A further result was that the herd became inferior to that which had existed and R.E.B.'s reputation as a source of breeding stock suffered. Because of a lack of reserve capital, the entire operation was sold on June 8, 1973.

Reversal is here sought on the following grounds:

1. The trial court's allowing recovery for both loss of future profits as well as diminution in the sale value of the hog farm. The argument is that this permitted a double recovery.

2. That damages for diminution of the value of the hog farm as well as loss of future profits went beyond the contemplation of the parties and therefore were not recoverable.

3. The evidence was insufficient to establish to the level of reasonable certainty that there would in fact be future profits.

4. The alleged error of the trial court in allowing the jury to consider future profits during a period after the plaintiff ceased the use of the hog feed.

I.

## AMENDMENT OF THE COMPLAINT

The amendments which were offered by R.E.B., Inc. following the remand included a claim for the capital loss which allegedly resulted from the sale of the business as of April or June 1973, which latter dates were some two years after the use of the bad feed. The other items were in essence specified demands which dealt with R.E.B.'s being prevented from conducting its normal business as a consequence of the use of bad feed.

■ In our opinion the trial court did not abuse its discretion in either allowing the particular amendments or in doing so after remand.[1]

Authority for granting amendments stems from Rule 15(a). It contemplates allowing amendments freely when justice requires. Changes or expansion are not to be allowed on remand if to do so would run counter to the mandate of the appellate court. Moore's Federal Practice ¶ 15.11; *Britton v. Dowell*, 243 F.2d 434 (10th Cir. 1957). In this case the mandate neither expressly nor implicitly dealt with the propriety of pleading changes.

■ The principal factors which are considered in connection with the offer of an amendment are, first, whether it will cause delay and, second, whether the adversary will suffer prejudice. Lateness does not of itself justify the denial of the amendment. Moore, *supra,* ¶ 15.-08(4); 4 A.L.R.Fed. 128. And the fact that it is offered following remand does not suffice of itself to require denial. *Retail Clerks International Assn. v. Lion Dry Goods, Inc.,* 341 F.2d 715, 722 (6th Cir. 1965). Unless the granting of the

1. Allowance of an amendment is within the discretion of the district court, unless the appellate court has issued a mandate calling for amendment or its mandate has precluded amendment. *See* Moore's Federal Practice ¶ 15.11, p. 971.

amendment after remand caused grave prejudice, the action is not an abuse of discretion. *See Patton v. Guyer,* 443 F.2d 79, 86 (10th Cir. 1971).

Ralston contends that the time of the amendment—five and one-half weeks before trial—deprived it of preparing a defense.[2] We disagree. The amendments did not propose substantially different issues. For example, the issue of future profit loss was present in the first trial as was the diminution in the value of the property. The most important effect of the amendments was to refine the demands.

Addition of a new claim may have the effect of complicating the proceeding. *See United States v. An Article of Drug,* 320 F.2d 564, 573–74 (3rd Cir. 1963). Similarly, the late addition of a party could produce the same result. *Derman v. Stor-Aid, Inc.,* 8 F.Serv. 15a.21, Case 1.

The mentioned problems are not present at bar. It was not error to allow the requested amendments.

## II.

## WERE THE DAMAGES WITHIN THE CONTEMPLATION OF THE PARTIES?

■ Ralston would have us rule that R.E.B.'s losses on account of lost profits and diminished value as a producing business are not recoverable under UCC §§ 2–714 and 2–715 for the reason that such consequential damages were not contemplated by the parties when the contract was entered into.

The factor which bears on this subject most significantly is that Ralston was in close relationship with R.E.B., Inc. during the entire period, including the time when the defective feed was being fed. Mr. McMillen, a Ralston representative, was shown to have had an active role in advising R.E.B. in its breeding operations and its finances. And, of course, Ralston had reason to know about the high degree of importance in having healthy stock as well as the dire consequences of having sickness sweep through the herd. *Cf. Lewis v. Mobil Corp.,* 438 F.2d 500 (8th Cir. 1971). A manufacturer should know that defective goods will disrupt production.

Ralston's position is that these items of damage do not flow naturally from breach of warranty as defined by the UCC. The Code does not express any such limitation. *See* § 2–715. And we have held that lost profits can be recovered where sufficiently proven.[3] Also, the Wyoming Supreme Court has not set itself against the award of lost profits in similar circumstances.[4] There were extensive offers of proof which were aimed at loss of profits and which were substantial and legally sufficient—at least for the year 1970–71.

R.E.B.'s evidence showed loss of good will and business reputation, and from outward appearances the jury gave a recovery for this loss. We have recognized that this can be proper. *See Westric Battery Co. v. Standard Electric Co., Inc.,* 482 F.2d 1307, 1317–18 (10th Cir. 1973). No Wyoming authority is called to our attention, but there is a substan-

---

**2.** *Cf. Trade Development Bank v. Continental Insurance Co.,* 469 F.2d 35, 46 (2d Cir. 1972). In this case there was an amendment on the day of trial, although notice had been given one month before.

**3.** *See e. g., Westric Battery v. Standard Electric,* 482 F.2d 1307 (10th Cir. 1973) (suggesting breach of warranty theory would have been sufficient basis to allow recovery of lost profits sufficiently proven); *DeVries v. Starr,* 303 F.2d 9, 14–21 (10th Cir. 1968); *Wells Truckways v. Burch,* 247 F.2d 194 (10th Cir. 1957).

**4.** *See, e. g., Reeder Flying Service v. Crompton,* 470 P.2d 281, 286 (Wyo.1970) (requiring damage awards to be "susceptible of ascertainment with a reasonable degree of certainty"); *Rocky Mountain Packing v. Branney,* 393 P.2d 131, 134–35 (Wyo.1964) (approving flexibility in damage award so that person injured "shall receive a compensation commensurate with his loss and no more"); *Diefenderfer v. Totman,* 73 Wyo. 409, 280 P.2d 284 (1955); *cf. Hunt v. Thompson,* 19 Wyo. 523, 120 Pac. 181 (1921).

tial body of case law which approves this. *See* Westric II, 522 F.2d 986 (10th Cir. 1975) and the cases cited in the body of that opinion.

In sum we are unable to see any merit to the contention that these heads of damage were outside the contemplation or anticipation of the appellant. Rather, in our view the troublesome problem is that which arises from the submission without limitation of both loss of profits and diminution of property value of the business. Stated differently, the serious problem is that of overlapping or double damage award.

## III.

## THE DOUBLE DAMAGE QUESTION

During the period of sale of the defective feed (from August 1, 1970 to April 1, 1971), there was direct injury in the form of death of hogs which were in the herd and loss of newly born pigs. Breeder hogs which had been produced for sale to other farms were also lost, and according to R.E.B. there was a loss of reputation in the trade plus the impeding of its planned program to improve the quality of its herd by the application of genetics.

The parties agree on at least one issue, that the Uniform Commercial Code as per the statutes of Wyoming § 34-2-102 (1973 Supp.) is applicable. Also undisputed is that Ralston violated the warranties imposed by law. *See* Wyo.Stat. § 34-2-314.

On account of the breach, R.E.B., Inc. is entitled to recover the loss resulting in the ordinary course of events " . . . as determined in any manner which is reasonable." Ordinarily damages would be measured by the difference "between the value of the goods accepted and the value they would have had if they had been as warranted." § 34-2-714(2) and where applicable " . . . any incidental and consequential damages." § 34-2-714(3). The statute broadly defines consequential damages from the seller's breach as "includ[ing] (a) any loss result-

ing from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise, and injury to person or property proximately resulting from any breach of warranty." § 34-2-715(2).

The issue of cost and diminution of the feed was finally resolved at the first trial and appeal. We do not disturb that judgment. Our concern is limited to the validity of the award to R.E.B. for consequential damages in the amount of $262,000. This judgment and verdict reflected R.E.B.'s demand for loss of profits during the period of delivery of the defective feed from August 1, 1970 until April 1, 1973, the date the ranch changed hands. Also claimed and apparently recovered was diminution of market value of the property (ranch, etc.) as of the date of sale, April 1, 1973.

The trial court instructed the jury, first, that it could consider as elements of damage the loss resulting from the decrease in value of the ranch as a whole as of the date of the sale. Included was loss resulting from harm to, and deaths of, the swineherd at its market value at the time of the injury. Second, the trial court correctly told the jury that it was authorized to award loss of profits if, but only if, the same were proven with reasonable certainty. The judge went on to say that it could award such damage only if it found that it was proximately caused by use of the defective feed. Significantly, the court did not limit the time during which such loss of profits could be recovered. Herein is found the double recovery. The reason for this is that the first allowance of damage covered the period starting in August 1970 and continuing to the date of sale of the ranch, April 1, 1973. Since this property loss included harm to, and deaths of, the swineherd as well as loss resultting from diminution of good will and going value of the business as a whole, it necessarily embraced loss of profits for the entire period on every-

thing except the losses from stillborn, miscarried and dead young pigs which resulted directly from the use of the defective feed during the period from August 1970 to April 1971. It seems clear then that this latter element could have been reasonably and legally considered under the head of loss of profits during the initial period of loss. Hence the profit loss ought to have been limited to this period and to this loss in order to have avoided double recovery.[5]

We now consider the amounts which were offered in the opinions of the experts on behalf of both parties. Mr. Ewasick for R.E.B. testified:

Lost profits from August 1, 1970
    to July 31, 1971     ·     $ 42,430

Lost profits from August 1, 1971
    to July 31, 1972     34,431

Lost profits from August 1, 1972
    to April 1, 1973 (when ranch
    was sold)     48,275

            Total     $125,136

In addition, this witness determined the diminished value of the ranch to be in the amount of $150,000.00.

Dr. Paulson testified also on behalf of R.E.B. He opined:[6]

Lost profits for the first period
    above     $21,147

Lost profits for the second period above     43,715

Lost profits for the third period above     28,176

            Total     $93,038

Paulson's estimate of diminished market value of the property (in addition to loss of profits) is $100,000.00.

In computing both loss of property values as well as loss of profits, both Ewasick and Paulsen took into account the efficiency of the operation generally and also the fluctuations of the market for hogs.

McMillen, who was called on behalf of Ralston, offered the following:

$ 9,367—market value for sows which died or were prematurely culled, August 1, 1970–July 31, 1971

6,546—market value of pigs stillborn during that same period

6,189—market value of pigs not born because sows didn't properly farrow, same period

19,689—market value of pigs born but not weaned (prematurely dying)

$41,791—Total damages to R.E.B. for defective feed

It is not difficult to perceive the double recovery in the light of the above evidence and analysis. What it boils down to is that the difference in value as of the time of sale takes into account the loss of quality as well as loss of numbers of the herd. But this does not include the loss of offspring resulting directly from the use of the defective feed. There is a right to recover for the year's production which was lost during the period August 1970 and continuing to July 31, 1971. However, R.E.B. cannot claim a right to continue to recover for lost production in the periods subsequent to July 31, 1971, after which it was not using the feed. Its loss of going value in maintaining a herd and selling breeding stock, together with good will loss in relationship to its customers all included in the aspect of property loss compensates R.E.B. for its losses during the periods after July 31, 1971. Ability to earn future profits is to be calculated as part of reduction of market value which

---

5. It is, of course, easier for us to examine this in retrospect than it was for the trial court at the time.

6. Originally, Dr. Paulson gave a total figure for loss of profits of $119,766. On redirect he changed this ⸗aying that he had not given effect to interest on a note as well as ad valorem taxes. His new total was the $93,038 amount set forth below. The individual figures have been projected in the amounts shown on the assumption that the interest and taxes would have been the same each year.

is said to be the present value of a projected profit stream.[7]

R.E.B. contends, however, that its market value loss is figured as of April 1, 1973, and hence lost profits ought also to be considered as of that date. Two things are wrong with this. First, it assumes to allow continued recovery for loss of progeny after they are, to the knowledge of R.E.B., permanently lost. Second, it would allow recovery for production potential of the sows in addition to the loss suffered as a consequence of their property value. Not only would this be conjectural, it would be double or worse. Profits and market value are intertwined.[8]

We hold then that the appropriate measure of damage is R.E.B.'s lost profits during the period August 1, 1970 through July 31, 1971, this being the fiscal year of the use of the defective feed. It was not used after August 1, 1971. R.E.B. is also entitled to diminished market value as it was demonstrated by the sale in 1973.[9]

There is little difference between the opinion of R.E.B.'s witness, Ewasick, and Ralston's witness, McMillen, as to the amount of profit for the year 1970–71. Both figure it as being approximately $42,000.00. McMillen gave no figures for loss of profits for subsequent years.

Since we see the problem of eliminating double recovery as calling for elimination of loss of profits for the periods after the fiscal year 1970–71, the only remaining determination is to ascertain a figure which fairly responds to the evidence. If we adopt the opinion of the witness Paulson as to loss of profits during the years 1971–73, it would amount to $43,715 for the 1971–72 year, and $28,176 for the fiscal year 1972–73 (first three months only). The total for this period is $71,891. In our view the judgment should be reduced in this amount. The result would be an award of $190,-109 rather than $262,000. Further, we consider remittitur as the preferable method for accomplishing this essential reduction.

## IV.

## DID R.E.B., INC. FAIL TO TAKE STEPS REQUIRED BY LAW TO MINIMIZE DAMAGES DURING THE PERIOD AFTER JULY 31, 1971?

Inasmuch as we have determined that there cannot be a recovery for lost profits during the period commencing August 1, 1971, the contention must be limited to diminution of the capital assets during the period commencing August 1 and continuing to June 1973.

It is true that the Uniform Commercial Code recognizes the principle that a party must take reasonable steps to minimize the damages. *See* Wyo.Stat. § 34–2–714(3), *supra*. *See also* Comment 2 to § 2–715. Thus, if goods are lost, steps ought to be taken to purchase substitute goods. Nor can an injured party continue using rejected equipment indefinitely, thereby building up consequential damages. *Cf. KLPR TV, Inc. v. Visual Electronics Corp.,* 465 F.2d 1382, 1388 (8th Cir. 1972). The ag-

---

7. *See Interstate United Corporation v. White,* 388 F.2d 5 (10th Cir. 1967) (approving valuation of a business based on a formula in which anticipated yearly profits were multiplied by rate of return multiplier).

8. *See Albrecht v. Herald Co.,* 452 F.2d 124 (5th Cir. 1971). There the court says the proper measure of property damage in an antitrust case is the same as for tort or breach of contract: the "difference in value between what the plaintiff's property is worth and what it would be worth but for the fault of the defendant." *Id.* at 128. The court went on to allow recovery of lost profits during the continuation of the defendant's unlawful activity (analogous to the 1970–71 bad feed year) plus loss to the "going concern" value of the business (the diminution of the business' market value). The court struck down that portion of the award for lost future profits as duplicative of recovery for lost going concern value.

9. Note that the bad feed was actually used from August 1, 1970–April 1, 1971, not for the full year. But even defendant's experts Hayden and McMillen concede that it is appropriate to consider the full year in which the feed was used: it may take up to four months for a farrowed sow to produce her litter.

grieved party is required to use reasonable diligence and ordinary care to lessen his damages, but he need not resort to extraordinary measures in order to mitigate. *Lynch v. Call,* 261 F.2d 130 (10th Cir. 1948); *Shidler v. Clayton Oil Company,* 502 P.2d 987 (Wyo.1972). Whether reasonable care has been exercised is generally a question of fact and a product of the surrounding circumstances. *See Asbell Bros., Inc. v. Nash-Davis Machinery Company,* 382 P.2d 57, 59 (Wyo. 1963).

Conceivably the aggrieved party could even be called upon to spend money in order to mitigate. *See Thayer v. Smith,* 380 P.2d 852, 854 (Wyo.1963). However, extraordinary expenses would not be required. *Id.* at 854.

■ Courts ordinarily require mitigation where the amounts are small and the risks involved are not great. It is not required that the injured party incur hazards, and so if the expenditures would be substantial, the injured party is excused from making a new investment. *See* 22 Am.Jur.2d § 37.

■ Moreover, a lack of sufficient funds can excuse absence of effort to lessen damages. *See* 22 Am.Jur.2d § 32. *See also* Comment Note, 81 A.L.R. 282, 284; *Valencia v. Shell Oil Co.,* 23 Cal.2d 840, 147 P.2d 558 (1944); *Thayer v. Smith,* 380 P.2d 852, 854 (Wyo.1963) (citing *Valencia*).

■ Neither *Valencia* nor *Thayer* involved breach of warranty under the UCC, but this does not change the principle. Lack of funds can afford an excuse for failure to mitigate. In the case at bar the herd was shown to have been decimated. Nevertheless, R.E.B. made every effort to cull the herd in order to improve its quality. The replacement animals came from R.E.B.'s own herd. In view of the financial inability of R.E.B. to purchase new boars, sows or gilts to replace those injured by the defective feed, it would appear that there was present an adequate excuse. The cost of replacement would have been great. Some 122 animals had been lost. It was estimated that the cost of a brood sow would have been between $250 and $300, whereby the total replacement cost would have been $36,000. There was no assurance that this would have solved the problem in that it would not necessarily have brought the herd back completely and immediately since there was no assurance that the replacement animals would have produced in accordance with expectations.

In sum, then, we are of the opinion that the plaintiff used reasonable efforts to cull the herd and thus tried to minimize its losses, and in view of the size of the expenditure and the financial inability of R.E.B., it was not required to replace the lost animals in order to fulfill the requirements of law.

\* \* \*

In conclusion we hold that the judgment of the district court should be affirmed with the exception of the approval of the jury award of damages insofar as they were overlapping. As to this, the plaintiff is ordered to file a remittitur in this court within 20 days from the date of receipt of this opinion in the amount of $71,891, which would reduce the amount of award to $190,109. If the appellee R.E.B., Inc. elects to remit the mentioned sum of $71,891, the judgment as adjusted will be and the same is hereby affirmed. If R.E.B., Inc. elects, however, to refuse to remit this sum, the judgment of the district court should be and the same is hereby reversed for a new trial on the issue of damages in accordance with the views expressed herein.