**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

ESTATE OF FRED O. GODLEY,
DECEASED; FRED D. GODLEY,
Administrator CTA,
                *Petitioners-Appellants,*

v.

COMMISSIONER OF INTERNAL REVENUE,
                *Respondent-Appellee.*

No. 01-1887

Appeal from the United States Tax Court.
(Tax Ct. No. 94-19880)

Argued: February 28, 2002

Decided: April 15, 2002

Before WILKINSON, Chief Judge, and NIEMEYER and
MICHAEL, Circuit Judges.

---

Affirmed by published opinion. Chief Judge Wilkinson wrote the
opinion, in which Judge Niemeyer and Judge Michael joined.

---

## COUNSEL

**ARGUED:** Carl Wells Hall, III, MAYER, BROWN & PLATT,
Charlotte, North Carolina, for Appellants. Joel L. McElvain, Tax
Division, UNITED STATES DEPARTMENT OF JUSTICE, Wash-
ington, D.C., for Appellee. **ON BRIEF:** Amy R. Murphy, MAYER,
BROWN & PLATT, Charlotte, North Carolina, for Appellants. Eileen
J. O'Connor, Assistant Attorney General, Richard Farber, Tax Divi-

sion, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

---

**OPINION**

WILKINSON, Chief Judge:

The Estate of Fred O. Godley ("Estate") appeals the decision of the Tax Court valuing Godley's fifty percent interest in five general partnerships and determining an estate tax deficiency of $247,714. The Estate contends that the Tax Court should have applied a minority discount by discounting Godley's interest in the partnerships because he lacked control over them.

Whether a minority discount is appropriate in a given situation is part of the larger factual question of valuation. Inasmuch as the Tax Court's valuation of Godley's interest was not clearly erroneous, we affirm.

I.

At the time of his death, decedent Fred O. Godley ("Godley") owned a fifty percent interest in five general partnerships. The remaining fifty percent was owned by Godley's son Frank D. Godley ("Godley, Jr."). Four of the partnerships, Monroe Housing for the Elderly, Clinton Housing for the Elderly, Rocky Mount Housing for the Elderly, and Charlotte Housing for the Elderly (collectively "Housing Partnerships"), were formed in 1978 and owned and operated housing projects for elderly tenants. The fifth general partnership, Godley Management Association ("GMA"), was formed in 1980 for the purpose of managing the operations of the Housing Partnerships. GMA held no real estate or other fixed assets and served only as a management company.

The Housing Partnerships held multifamily rental housing projects operated under Housing Assistance Payments contracts ("HAP contracts") with the United States Department of Housing and Urban Development. *See* United States Housing Act of 1937, 42 U.S.C.

§§ 1437-1437x; Department of Housing and Urban Development Act, 42 U.S.C. §§ 3531-3547. Pursuant to the HAP contracts, Housing Assistance payments are made to the Housing Partnerships to cover the difference between the rental rates agreed to under the HAP contracts and the portion of the rent paid by eligible families. In addition, in the event of a vacancy, the HAP contracts entitled the owner to payments in the amount of eighty percent of the contract rent for up to sixty days. If the vacancy period exceeded sixty days, the owner could request additional payments. The term of the HAP contracts for Monroe, Charlotte, and Rocky Mount was thirty years and the term for Clinton was twenty years.

Godley, Jr. was the managing partner for the Housing Partnerships. This gave him control over the overall management of the partnerships.[1] Godley, Jr. likewise took care of the day-to-day management of the Housing Partnerships. He would pay bills, set aside reserves for replacement of assets or to cover contingencies, and acquire those properties that the partnership had decided upon. However, Godley, Jr. could not make any "major decision" without the affirmative vote of seventy-five percent of the partnership shares. "Major decisions" included buying or selling land or partnership property, securing financing, spending in excess of $2,500, entering into major contracts, or taking any other action "which materially affects the Partnership or the assets or operation thereof."

Despite the fact that Godley, Jr. was the managing partner, Godley was actively involved in the Housing Partnerships. He regularly visited the housing projects to inspect the property and attend to the tenants' concerns. And he made his own decisions when issues with the

---

[1]The applicable provision of the partnership agreement is as follows:

§ 2.02 *Management of Partnership*. The overall management and control of the business and affairs of the Partnership shall be vested in the managing Partner (the "Managing Partner") designated herein, provided, however, no act shall be taken or sum expended or obligation incurred by the Partnership, or any Partner, with respect to a matter within the scope of any major decision ("major decision") affecting the Partnership, unless such major decision had been approved by Partners holding collectively a 75% interest in the Partnership.

tenants arose. Godley had a long history as a business man in construction and when he was engaged in a business enterprise, he was almost always the person in charge.

At the time of Godley's death, each partnership agreement contained a provision granting Godley, Jr. the option to purchase Godley's interest in that partnership for $10,000. Godley, Jr. exercised these options and purchased Godley's interest in all the partnerships for a total of $50,000. On Godley's federal estate tax return, his interests in the five partnerships were reported at a fair market value of $10,000 each, the option price.

On August 2, 1994, the Internal Revenue Service mailed a statutory notice of deficiency in federal estate tax of $694,554 to the Estate. The IRS disregarded the option price and instead determined the value of Godley's fifty percent interest by looking at the value of the partnerships' assets and the income generated by them. The IRS applied a discount to the value it determined based on the inability to easily sell a fifty percent interest in a closely-held company ("lack of marketability discount"), but it did not apply a discount because Godly lacked control over the partnerships ("minority discount").

The Estate petitioned the Tax Court for a redetermination of the deficiency based upon the value set forth in the options. In the alternative, the Estate requested a valuation based upon the fair market value of Godley's fifty percent interests with discounts. Specifically, the Estate argued that the IRS should have applied a minority discount when determining the fair market value of Godley's interests. During the trial, the Estate presented expert testimony on the valuation of the partnership interests. The IRS did not present expert testimony as to the value of the Housing Partnerships, but did introduce the report of Mitchell Kaye, a valuation expert who had testified in an earlier state proceeding involving Godley, Jr., as to the value of GMA.[2]

---

[2]Godley, Jr. was the defendant in an equitable distribution suit brought by his former spouse. The value of Godley Jr.'s fifty percent interest in the general partnerships was at issue during this suit. Kaye was an expert witness for the plaintiff.

The Tax Court determined, after three days of trial, that the options served a testamentary purpose, and therefore, disregarded them in valuing Godley's interests. The court then determined the value of the Housing Partnerships by modifying the valuation methodology of one of the experts and applying a twenty percent lack of marketability discount. The Tax Court accepted Kaye's report on the valuation of one hundred percent of GMA. No minority discount for lack of control was applied to any of the five partnerships. The court finally determined that there was an estate tax deficiency of $247,714. The Estate appeals.

## II.

The Estate contends that whether Godley's fifty percent interest represented a lack of control over the five partnerships, thereby entitling Godley to a minority discount, is a question of law. We disagree. The question of whether a taxpayer is entitled to a discount is intertwined in the larger question of valuation and valuation determinations are clearly questions of fact.

## A.

We review *de novo* the Tax Court's conclusions on questions of law. *Waterman v. Comm'r*, 179 F.3d 123, 126 (4th Cir. 1999). However, the Tax Court's findings of fact may be set aside only if they are clearly erroneous. *Burbage v. Comm'r*, 774 F.2d 644, 646 (4th Cir. 1985). Determinations of fair market value constitute findings of fact and, therefore, are subject to review only for clear error. *Id.*

The fair market value of a business interest can often be determined simply by examining its market price. However, a closely-held company frequently has no ready market for its shares. Therefore, "[t]he fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." *United States v. Cartwright*, 411 U.S. 546, 551 (1973) (quoting Treas. Reg. § 20.2031-1(b)). When determining the fair market value under this test, a fact finder must look to "the existing facts, circumstances, and factors at the valuation date that influence a hypothetical willing buyer and willing seller in

determining a selling price." *Estate of Newhouse v. Comm'r*, 94 T.C. 193, 231 (1990). The weight to be given to these various factors depends upon the facts of each case. *Estate of Andrews v. Comm'r*, 79 T.C. 938, 940-41 (1982). And the amount a willing buyer will pay is often not based solely on asset values or net worth. Often, a discount or premium must be applied to reflect the value an investor places on things such as managerial control, ability to re-sell the shares, and other risks.

## B.

During valuation a fact finder must decide whether the value should be increased or discounted for any reason. A minority discount may be appropriate if the block of stock does not enjoy the rights associated with control of the enterprise. *Estate of Chenoweth v. Comm'r*, 88 T.C. 1577, 1582 (1987). The application of such a discount is only appropriate if, as a factual matter, the minority status of the interest would affect the value that a willing buyer would pay. Thus, the question of whether a discount for a lack of control is warranted depends, like the question of valuation generally, on the facts and circumstances of the case.

Control has been defined as an interest which allows the shareholder to "unilaterally direct corporate action, select management, decide the amount of distribution, rearrange the corporation's capital structure, and decide whether to liquidate, merge, or sell assets." *Estate of Newhouse*, 94 T.C. at 251-52. These various powers support applying a control premium to a controlling block of shares in order to reflect the inherent value of that controlling interest. On the other hand, a minority discount is applied to reflect the lack of power and risks a minority interest poses. And like a corporate minority shareholder, "a limited partner generally has no voice in the management of the partnership and cannot control investment policies or partnership distribution," so a minority discount may apply to the value of that interest as well. *Estate of Bischoff v. Comm'r*, 69 T.C. 32, 49 (1977).

A premium for control or discount for lack of control may be appropriate as a factual matter for several reasons. First, an investor who believes a business may be improved by better management or

other changes may be willing to pay more for a controlling interest. "Investors often pay a premium when they believe that they have unearthed an undervalued corporation." Bittker & Lokken, *Federal Taxation of Income, Estates and Gifts* § 135.3.4 (2d ed. 1993). An investor purchasing a minority interest, however, may recognize that he will be unable to make any changes and will, therefore, want to pay less than fair market value. Second, control over a business may decrease the risk a particular investment poses to the investor, increasing the value of that interest. And an investor will also recognize that the increased risks a minority shareholder faces may decrease the value of an interest. Third, with control over the business, an investor may be able to pay himself an excessive salary or to otherwise self-deal. Bittker & Lokken, *supra*, § 135.3.4. While courts would be unlikely to recognize any such prospect as the basis for a control premium, the minority shareholder may risk falling victim to such self-dealing. Thus, the rights conveyed by corporate control, "the ability to determine management, distributions, and corporate structure," enhance the value of the corporation and command a premium. William S. Blatt, *Minority Discounts, Fair Market Value, and the Culture of Estate Taxation*, 52 Tax L. Rev. 225, 231 (1997). "Conversely, in recognition of the potential exploitation of minority shareholders, stock lacking control generally receives a minority discount." *Id.* (footnote omitted). Any of these rationales may support a factual finding that control warrants a premium, or that the lack thereof warrants a discount. Absent some explanation of why control has economic value, however, no premium or discount is warranted.

It is true that in a closely-held corporation, a minority interest in stock is ordinarily discounted to reflect lack of control. *See Theophilos v. Comm'r*, 85 F.3d 440, 449 (9th Cir. 1996); *Estate of Bright v. United States*, 658 F.2d 999, 1002-03 (Former 5th Cir. 1981) (en banc). However, the mere presumption that a discount may exist does not lead to the conclusion that a discount must be applied as a matter of law whenever a shareholder owns less than fifty-one percent of a corporation. Our view that the question of whether to apply a minority discount is factual in nature is one that is widely shared. *See Estate of Ford v. Comm'r*, 53 F.3d 924, 926 (8th Cir. 1995) ("The issues of valuation and applicability of marketability and minority interest discounts are factual questions which we review under the

clearly erroneous standard."); *Ahmanson Foundation v. United States*, 674 F.2d 761, 770 (9th Cir. 1981) ("[I]t was not clear error for the district judge to find that there would be no control premium paid for the . . . shares."); *Estate of Chenowith*, 88 T.C. at 1589 (1987) ("The amount of such control premium presents a material issue of fact."). We thus turn to the facts of the case at hand.

III.

In this case, the Tax Court determined that the value of the partnership interests was subject to a discount for lack of marketability, but not for the alleged lack of control. This finding was not clearly erroneous. As the evidence demonstrates, there was little to be gained by having control of these partnerships and little risk in holding a minority interest.

Here, the Housing Partnerships were guaranteed a long-term, steady income stream under the HUD contracts. The Housing Partnerships had little risk of losing the HUD contracts and the management of the properties did not require particular expertise. Indeed, the HUD contracts allowed the Housing Partnerships to collect above-market rents, and there was no other use for the partnerships that would increase their profits. Therefore, control of the Housing Partnerships did not carry with it any appreciable economic value. Nor did a lack of control reduce the value of a fifty percent interest such that a minority discount was required.

The Estate argues that a minority discount was required because "the record supports a finding that the managing partner had significant latitude in determining the extent of partnership distributions and the amounts set aside in reserve." However, each partnership agreement required the partnership to distribute its "net cash flow" annually and set forth a specific calculation of that net cash flow. There was no risk that Godley, a fifty percent partner, would not realize an annual payout. Although the agreements also granted the managing partner the power to set aside reserves, that power was characterized as one of "day-to-day management." It appears unlikely that this "set aside" power could be used to defeat the requirement of an annual distribution. At a minimum, Godley could exercise his power under the partnership agreements to prevent any change to the guarantee of

an annual distribution. Thus, as the Tax Court determined, Godley was effectively guaranteed a reasonable annual distribution of partnership income. And while an inability to force a distribution of income may under other circumstances warrant a discount for lack of control, the Tax Court correctly found that this factor was not relevant in this case.

Similarly, the Estate contends that Godley's fifty percent interest made it impossible for him to compel liquidation or sell partnership assets. However, neither Godley nor Godley, Jr. could compel liquidation or make any "major decision" without the affirmative vote of seventy-five percent of the partnership shares. Moreover, given the passive nature of the business and the almost certain prospect of steady profits, the ability to liquidate or sell assets was of little practical import. Thus, as the Tax Court reasoned, the guarantee of above-market rents and other factors unique to the Housing Partnerships meant that the power to liquidate the partnership or to sell partnership assets would have minimal value to an investor.

The Tax Court's decision not to apply a minority discount to GMA, the fifth partnership, was also not clearly erroneous. GMA was a holding company without any assets that served as a vehicle to ensure compliance with HUD regulations. Any profits or losses attributed to GMA were simply those funneled through it from the Housing Partnerships. Thus, the presence of a low-risk, stable stream of income that justified not applying a minority discount to the value of the Housing Partnerships was equally present with respect to GMA.

The Tax Court carefully considered the expert testimony, the expert valuations of the partnerships, and the unique nature of the rent-controlled housing business in reaching its decision not to apply a minority discount to Godley's fifty percent interest. That court looked at "the existing facts, circumstances, and factors at the valuation date that influence a hypothetical willing buyer and willing seller in determining a selling price." *Estate of Newhouse*, 94 T.C. at 231. We are satisfied that the Tax Court's valuation determinations were not clearly erroneous.[3]

---

[3]The Estate also contends that the Tax Court improperly relied on the valuation report and testimony of Kaye. It contends that Kaye's report

## IV.

For the foregoing reasons, the judgement of the Tax Court is

*AFFIRMED*.

---

was accepted in the state court as a valuation of all of GMA, not of a fifty percent interest in that business and therefore, cannot be an accurate valuation of Godley's interest in GMA. However, we do not think that the Tax Court relied solely on Kaye's report in reaching its valuation decision in this case. As noted, the facts support the Tax Court's valuation determination, and the Estate has failed to proffer sufficient evidence of inaccuracies in Kaye's report to warrant a departure from the deferential standard we apply to a trial court's evaluation of expert testimony. *See Sammons v. Comm'r*, 838 F.2d 330, 334 (9th Cir. 1988).