**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**OCT 6 2003**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

EATERIES, INC., an Oklahoma corporation;
FIESTA RESTAURANTS, INC., an Oklahoma
corporation,

      Plaintiffs-Appellees and
      Cross-Appellants,

v.

J. R. SIMPLOT COMPANY, a Nevada
corporation,

      Defendant-Appellant and
      Cross-Appellee.

Nos. 02-6060 & 02-6063

---

**Appeal from the United States District Court**
**for the Western District of Oklahoma**
**(D.C. No. 99-CV-1330-C)**

---

Lana Jeanne Tyree (Ronald E. Stakem of Clark, Stakem, Wood & Patten, P.C.
Oklahoma City, Oklahoma, with her on the briefs) of Cartwright & Tyree,
Oklahoma City, Oklahoma, for Plaintiffs-Appellees and Cross-Appellants.

Mack J. Morgan III (D. Kent Meyers with him on the briefs) of Crowe &
Dunlevy, Oklahoma City, Oklahoma, for Defendant-Appellant and Cross-
Appellee.

---

Before **KELLY,** Circuit Judge, **BRORBY**, Senior Circuit Judge, and **MURPHY**,
Circuit Judge.

**BRORBY**, Senior Circuit Judge.

_____

J.R. Simplot Company appeals the district court's award of damages to Eateries, Inc., and Fiesta Restaurants, Inc. Eateries and Fiesta likewise appeal a portion of the damage award. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm in part and reverse in part.

## BACKGROUND

Eateries is the sole shareholder of Fiesta. Fiesta owns and operates several Garcia's Mexican Restaurants. Eateries and Fiesta contracted with Simplot for Simplot to provide the Garcia's restaurants with chile rellenos. Simplot delivered the chile rellenos but some of them were contaminated with salmonella. Customers at four Garcia's locations became sick after eating the contaminated chile rellenos. Newspaper and television stations provided extensive coverage of the salmonella contamination.

Seeking to recover the damage they incurred as a result of the salmonella contamination, Eateries and Fiesta filed suit in Oklahoma state court alleging breach of contract and breach of express and implied warranties. Simplot removed the case to United States District Court for the Western District of

Oklahoma based on diversity jurisdiction. Simplot then admitted liability for selling the contaminated chile rellenos. After a bench trial on damages, the district court awarded Eateries and Fiesta "$6,551,264.40, plus attorney's fees and costs." Both sides filed motions asking the district court to amend its findings and judgment. After considering the motions, the district court entered an amended memorandum opinion and judgment awarding Eateries and Fiesta "$8,405,420.13, plus attorney's fees and costs." Simplot appealed, and Eateries and Fiesta cross-appealed.

On appeal, Simplot argues the district court used an incorrect methodology to calculate damages and erroneously allowed a double recovery. Eateries and Fiesta argue the district court erred in calculating the extent of damages. Before reaching the merit of these arguments, we first discuss the analysis underlying the district court's damage award.

In essence, the district court compared Eateries' fair market value before the salmonella contamination with Eateries' fair market value after the salmonella contamination and awarded the difference as damages to Eateries and Fiesta. The district court also awarded damages for Eateries' and Fiesta's increased insurance costs.

In arriving at Eateries' fair market value prior to the salmonella contamination, the district court considered a pre-contamination offer to purchase Eateries' assets. A few weeks before the salmonella contamination occurred, Halpern, Denny & Company offered to purchase Eateries' assets for approximately $9.00 per share. This price was greater than the price of Eateries' publicly traded stock because the price included a premium for control of the company. Halpern Denny withdrew its offer in the aftermath of the salmonella contamination because Eateries' value declined. Several months later, Halpern Denny made a new offer of about $4.00 per share, but Eateries rejected it. In any event, the district court found the $9.00 per share offer reflected Eateries' fair market value prior to the salmonella contamination.

The district court's calculation of Eateries' fair market value after the salmonella contamination is a bit more complex. The district court based its calculation on an Eateries stock repurchase that took place roughly seven months after the salmonella contamination occurred. An investor owning about 27 percent of Eateries' outstanding shares contacted Eateries about selling all its (the investor's) stock. Rather than allowing the investor to drive down the price of Eateries stock by dumping its shares on the market, Eateries repurchased the investors' stock for $5.125 per share. This repurchase price was the "then

existing market price for the stock." The district court, however, concluded the repurchase price alone did not reflect the fair market value of Eateries because it did not include a premium for control of the company. Finding "a premium of 30% to 40% is common," the district court added a 35 percent control premium to the $5.125 per share repurchase price, arriving at a value of $6.92 per share. The district court found this value reflected Eateries' fair market value after the salmonella contamination.

Subtracting the $6.92 per share post-contamination value of Eateries from its $9.00 per share pre-contamination value, the court concluded Eateries "suffered harm of $2.08 per share." The court then multiplied this amount by the number of Eateries shares (3,942,643), yielding diminution in value damages of $8,200,697.40.

The district court also awarded Eateries and Fiesta "damages for increased insurance premiums." The district court found there was "evidence that as a result of the salmonella incident [Eateries' insurance] premiums increased by at least $109,000.00 per year." It concluded Eateries and Fiesta were entitled to two years worth of Eateries' future increased insurance costs. The district court discounted the value of these increased insurance premiums to present value using

a 5 percent interest rate, concluding Eateries and Fiesta were damaged in the amount of $202,675.73 for increased insurance costs.

## DISCUSSION

We now turn to the parties' arguments. As discussed above, Simplot argues "the district court erred as a matter of law by using an invalid methodology to calculate diminution damages." Simplot also believes "the district court's award of increased insurance premiums erroneously allows a double recovery and fails to address causation." Eateries and Fiesta also believe the district court's damage award is incorrect, arguing "the district court erred in adding 35% as a control premium to the 'after incident' stock repurchase price when calculating Eateries' diminution in value."

"We review the amount of a damage award for clear error and questions of law de novo. The methodology a district court uses in calculating a damage award, such as determining the proper elements of the award or the proper scope of recovery, is a question of law" we review de novo. *So. Colo. MRI, Ltd. v. Med-Alliance, Inc.*, 166 F.3d 1094, 1100 (10th Cir. 1999) (citations omitted). "We review the district court's underlying factual determinations regarding the amount of damages for clear error." *Nieto v. Kapoor,* 268 F.3d 1208, 1221 (10th

Cir. 2001). *See also Furr v. AT&T Tech., Inc.*, 824 F.2d 1537, 1547 (10th Cir. 1987) ("The amount of damages is a factual issue and we will uphold the district court's findings of fact unless they are clearly erroneous.").

I.      **Party Awarded Damages**

Simplot argues the district court erred in awarding damages based on Eateries' diminution in value rather than on Fiesta's diminution in value. Simplot asserts "[w]hen a business directly damaged is a wholly-owned subsidiary of a separate legal entity, only the subsidiary (not the parent) may recover for the loss." At the heart of Simplot's argument is its belief only Fiesta (the subsidiary that owned the restaurants) suffered damages. Because Eateries (the parent) did not have any "direct ownership interest in the restaurants," Simplot believes the court erred in "award[ing] Eateries diminution damages for restaurants it does not own." We conclude the invited error doctrine prevents Simplot from seeking reversal on this issue.

"The 'invited error' doctrine is equitable in nature." *Richardson v. Mo. Pac. R.R. Co.*, 186 F.3d 1273, 1277 (10th Cir. 1999). It "'prevents a party from inducing action by a court and later seeking reversal on the ground that the requested action was error.'" *John Zink Co. v. Zink*, 241 F.3d 1256, 1259 (10th

Cir. 2001) (quoting *United States v. Edward J.*, 224 F.3d 1216, 1222 (10th Cir. 2000)).

After reviewing the record, we conclude Simplot's position on appeal contradicts its arguments to the district court. On several occasions, Simplot urged the district court to award damages based on Eateries' diminution in value, albeit in a lesser amount of damages than the district court awarded. In fact, one of Simplot's own experts concluded "the best measure of damages" is to calculate "Eateries' lost equity value due to the salmonella incident." In a strange twist of events, Simplot now argues, although its expert "offer[ed] an opinion regarding diminution in market value," the district court should not have relied on its expert's methodology because there was "no credible evidence" to support this method. The fact remains, however, Simplot urged the district court to adopt its expert's methodology. The invited error doctrine prevents Simplot from advocating a contrary position on appeal.[1]

---

[1] In a related argument, Simplot claims "[t]he amount of the diminution award undeniably confirms the invalidity of [awarding damages based on Eateries' diminution in value rather than Fiesta's diminution in value]. The District Court calculated diminution damages for a temporary loss of sales as being roughly equal to the entire value of the [Fiesta] restaurants as calculated by Plaintiffs themselves." Simplot asserts "even if the Phoenix Garcia's Restaurants had been completely destroyed, the damages could not exceed their total value." Even assuming this argument was not waived when Simplot urged the district court to award diminution damages based on Eateries' loss, this argument fails

## II.    Values Compared in Diminution of Value Calculations

Simplot next argues the district court "us[ed] inappropriate and incongruent values to calculate [the] diminution [in value] damages."  Simplot claims the court erroneously found "the Halpern Denny contingent, verbal offer for Eateries' assets was comparable to [Eateries'] privately negotiated stock repurchase some seven months later."  Simplot also claims "the values used by the District Court were not accurate measures of the enterprise value of Eateries on either date."  Simplot believes the court should have calculated the difference between the price of Eateries' publicly traded stock before and after the salmonella contamination because this is "clearly the best evidence" of Eateries' damages.

In their cross-appeal, Eateries and Fiesta argue the district court's finding of Eateries' post-contamination fair market value was erroneous.  They claim "[t]he district court erred in adding 35% as a control premium to the 'after incident' stock repurchase price when calculating Eateries' diminution in value."

---

because it presupposes Simplot is liable only for harm to Fiesta.  Yet Eateries suffered damages in its own right.  For example, Simplot contracted with Eateries to supply the chile rellenos to the Fiesta restaurants.  The record also shows, as a result of the contamination, Eateries' insurance premiums increased.  Consequently, it is of little help to compare the total damage Eateries incurred to the value of the specific Phoenix area Fiesta restaurants.

Simplot believes we should review its argument de novo, characterizing its argument as attacking the district court's methodology. We disagree with this characterization. Simplot's argument is properly characterized as a challenge to the district court's factual findings of Eateries' fair market value before and after the salmonella contamination, not a challenge to the methodology itself. We therefore review its argument, as well as Eateries' and Fiesta's argument, for clear error. *See Nieto*, 268 F.3d at 1221. As explained below, we conclude the district court's factual findings of fair market value are not clearly erroneous.[2]

## A.    Pre-Contamination Value

As to Eateries' fair market value before the salmonella contamination, Simplot argues the Halpern Denny offer does not represent fair market value

---

[2] In any event, we conclude the district court used a proper methodology. As is clear from the district court's opinion, it calculated damages by comparing the Eateries' fair market value before the contamination with Eateries' fair market value after the contamination. Fair market value is "[t]he price that a seller is willing to accept and a buyer is willing to pay on the open market and in an arm's-length transaction." *Black's Law Dictionary* 1549 (7th ed. 1999). *See also Rhodes v. Amoco Oil Co.*, 143 F.3d 1369, 1373 n.4 (10th Cir. 1998). However, "a stock's price on the public markets [does not] conclusively establish[] its fair market value." *Falls v. Fickling*, 621 F.2d 1362, 1369 (5th Cir. 1980). Diminution in fair market value is an appropriate methodology. *See Protectors Ins. Servs., Inc. v. United States Fid. & Guar. Co.*, 132 F.3d 612, 615-18 (10th Cir. 1998); *Mattingly, Inc. v. Beatrice Foods Co.*, 835 F.2d 1547, 1559 (10th Cir. 1987), *vacated on other grounds*, 852 F.2d 516 (10th Cir. 1988). It is also the methodology urged by one of Simplot's experts at trial.

because it believes the offer was "contingent" and "subject to change." Simplot's characterization of the offer contradicts the district court's factual findings. The district court specifically found "[a]lthough it had not yet been reduced to writing, Halpern, Denny & Company considered that it had an agreement to purchase Eateries' assets. But for the salmonella incident, the sale of Eateries' assets to Halpern, Denny & Company would have closed." This finding is supported by the record. Halpern Denny sent Eateries a letter citing the salmonella contamination as the reason it was backing out of the agreement. The president of Eateries testified he believed the contamination was the sole reason Halpern Denny chose not to complete the agreement. One of Halpern Denny's general partners confirmed this testimony. Thus, we reject Simplot's assertion the offer did not represent Eateries' fair market value because it was too speculative.

In a related argument, Simplot maintains "there was no evidence offered to quantify the control premium which was included in the [Halpern Denny] offer ... [b]ecause there was no set closing date" on the offer. We reject this argument because the record reveals several witnesses testified about the existence and amount of the control premium.[3] In any event, Simplot waived this argument by

---

[3] Part of this testimony is discussed *infra* in Part II.B.2.

failing to raise it before the district court and in its opening brief on appeal. *See McDonld v. Kinder-Morgan, Inc.*, 287 F.3d 992, 999 (10th Cir. 2002); *State Farm Fire & Cas. Co. v. Mhoon*, 31 F.3d 979, 98 n.7 (10th Cir. 1994).[4]

Based on the record before us, we conclude the district court did not commit clear error in finding the Halpern Denny offer represents Eateries' pre-contamination fair market value.

**B.      Post-Contamination Value**

While only Simplot opposed the district court's determination of the pre-contamination value of Eateries, both sides appeal the district court's determination of Eateries' post-contamination fair market value. As discussed above, the district court arrived at Eateries' post-contamination fair market value by adding a 35 percent control premium to the price Eateries paid to repurchase its stock because the repurchase price "fail[ed] to account for a control premium." Simplot believes the court erred in relying on the stock repurchase price. Eateries

---

[4] Simplot also argues "[t]here was no evidence introduced that supports the proposition that the Halpern, Denny offer for the assets only of Eateries constitutes fair market value. It clearly does not because the liabilities are not also assumed." Once again, however, Simplot did not raise this argument before the district court or in its opening brief on appeal. We therefore decline to address it. *See McDonald*, 287 F.3d at 999; *State Farm*, 31 F.3d at 984 n.7.

and Fiesta argue the court should not have added a 35 percent control premium. Addressing each argument in turn, we conclude the district court's findings are not clearly erroneous.

### 1. Stock Repurchase Price

As to the post-contamination value, Simplot devotes a few sentences to argue that the stock repurchase price does not reflect the true market value because it was "a forced purchase." Simplot suggests the stock repurchase did not involve a willing buyer and a willing seller.

We conclude Simplot's superficial argument is insufficient to garner appellate review. We first note Simplot has not offered any record citations or legal authority in support of its argument. "We need not sift through the record to find [evidence to support a party's argument], nor manufacture a party's argument for [it]." *Sil-Flo, Inc. v. SFHC, Inc.*, 917 F.2d 1507, 1513 (10th Cir. 1990) (quotation marks and citations omitted). A party forfeits an issue it does not support with "legal authority or argument." *Clark v. State Farm Mut. Auto. Ins. Co.*, 319 F.3d 1234, 1244 (10th Cir. 2003). Furthermore, as in its previous arguments, Simplot did not raise its contention the sale was "forced" before the

district court or in its opening brief.[5]  It therefore waived this argument.  *See*

*McDonald*, 287 F.3d at 999; *State Farm*, 31 F.3d at 984 n.7.  Under these

circumstances, we conclude Simplot's belated and "perfunctory" challenge to the

district court's findings on post-contamination fair market value is "insufficient to

invoke appellate review."  *Robey-Harcourt v. BenCorp Fin. Co.*, 326 F.3d 1140,

1143 (10th Cir. 2003).

### 2.    Control Premium

In their cross-appeal, Eateries and Fiesta argue "the district court erred in

adding 35% as a control premium to the 'after incident' stock repurchase price

when calculating Eateries' diminution in value."  They maintain the court should

not have added any control premium because the repurchase price already included

a premium.  Alternatively, Eateries and Fiesta claim the district court should have

added no more than a 26.4 percent premium.

A control premium is "[a] premium paid for shares carrying the power to

---

[5] Simplot did mention in its opening brief the stock repurchase was "privately negotiated."  Simplot, however, did not elaborate on this point at all or provide record support.  Nevertheless, we do not think the mere fact a purchase is "privately negotiated," without more, somehow indicates the purchase price is not at least a good starting point for determining fair market value.

control a corporation." *Black's Law Dictionary* 1200 (7th ed. 1999). Depending on the facts of a particular case, it may be a relevant factor in the fair market value analysis. *See Estate of Godley v. Commissioner*, 286 F.3d 210, 214-15 (4th Cir. 2002); *Joe Esco South-West Tire Co. v. United States*, 582 F. Supp. 993, 1001 (W.D. Okla. 1983). While "it is generally recognized that majority stock is more valuable than minority stock," *McDaniel v. Painter*, 418 F.2d 545, 548 (10th Cir. 1969), the amount of a control premium is a question of fact determined on a case-by-case basis, *see Godley*, 286 F.3d at 214-16; *Joe Esco Tire*, 582 F. Supp. at 1001.

As to Eateries' and Fiesta's argument the stock repurchase price already included a premium, we conclude there is sufficient evidence to support the district court's finding that the repurchase price "fail[ed] to account for a control premium." The president of Eateries testified the stock repurchase price was the "then existing market price [of] the stock." This indicates the repurchase price did not include a premium. Other testimony stated Eateries repurchased only a minority interest in Eateries. This also suggests the repurchase price of the stock did not include a premium for control of the company.

Eateries and Fiesta concede the repurchase price did not contain a "*control*

-15-

*premium*," but nevertheless argue the repurchase price included "a premium above market price" and a "premium is [a] premium." They rely on the opinion of their expert who testified the repurchase price "represented a premium above the market trading price." After reviewing the evidence, we conclude the district court did not commit clear error in finding the repurchase price did not include a control premium and a premium should be added. As discussed above, the president of Eateries testified the repurchase price represented the "then existing market price." It was not error for the district court to credit this testimony and disregard the testimony of Eateries' expert. Thus, we will not upset the district court's finding.

Eateries and Fiesta next argue that even if the court was correct in adding a control premium, the court should have added at most a 26.4 percent control premium because the "actual control premium included within the Halpern Denny pre-incident offer ... was 26.4%." Eateries and Fiesta raised a similar argument in their motion to alter or amend the district court's first decision. The district court responded by stating their argument was "contrary to the Court's determination of the evidence." The district court found that "[w]hile there was testimony supporting different percentage amounts, the percentage used by the Court was based on the testimony found most credible by the Court."

We find adequate support in the record for the district court's finding of a 35 percent control premium. The district court heard a variety of conflicting testimony concerning the amount of a control premium. One of Eateries' experts, Mr. Payne, calculated a control premium of 26.4 percent for the pre-contamination Halpern Denny offer. He arrived at this percentage by averaging Eateries' high and low stock price during a two-month time period. Mr. Payne testified the average control premium paid for similar businesses during this time period was 31.6 percent. In addition, one of Halpern Denny's general partners testified the $9.00 per share offer represented a market multiple of 6.7 and the stock was trading at about a 5.5 multiple. Although he did not specifically calculate the amount of the control premium, he testified the offer included "a premium to the market" and the premium was "usual." The district court also heard testimony about typical control premiums from Simplot's experts. Mr. Wilsey testified a normal control premium was between 25 and 40 percent. Mr. Davis testified a "typical[]" control premium would be between 30 and 40 percent. The district court apparently found Mr. Davis' testimony the most credible. We must give "due regard" to the district court's credibility determination. *See* Fed. R. Civ. P. 52(a).

Eateries and Fiesta nevertheless argue "[i]t was error for the Court to rely on

the most general estimates of potential control premiums when the Court had an actual control premium related to Eateries immediately before the damage." This argument mischaracterizes their expert's testimony as calculating an *actual* control premium. Their expert, however, did not and could not calculate a precise pre-contamination control premium because there was no set closing date for the sale to Halpern Denny. Instead, the experts estimated the control premium by averaging the high and low stock price during what he deemed the relevant time period. We cannot conclude the district court erred in discounting this testimony and instead crediting other testimony. *See Anderson*, 470 U.S. at 574-75 (noting the "special deference to be paid [to] credibility determinations" under Federal Rule of Civil Procedure 52(a)).

Eateries and Fiesta also argue that because Eateries was "a distressed company after the salmonella incident[,] ... there is no evidence and no reason to assume that a control premium would apply, much less increase [to 35 percent], while the value of the company, generally, decreased." Even though Eateries may have been "distressed," we nonetheless conclude there is sufficient evidence in the record to support the district court's finding that a 35 percent control premium should apply.

We conclude the district court did not commit clear error in adding a 35 percent control premium to the stock repurchase price to arrive at Eateries' post-contamination fair market value.

## III. Causation

Simplot next argues the district court erred because it failed to address "the undisputed existence of multiple other factors that caused or contributed to a decline in Eateries' value." Simplot believes the district court "erroneously and incredibly assumed that the sole, proximate cause of the change in Eateries stock price over a seven month time frame was the salmonella Incident." Simplot claims the district court should have awarded only "nominal damages" because the district court failed to consider the effect of:

> (1) Market conditions, including the performance of Eateries' peers and the restaurant industry in general during this time frame; (2) Eateries' second quarter earnings announcements; (3) Eateries' earnings; (4) Performance of [other Eateries'] restaurants during this period of time; (5) Acquisition of control by the management directors of Eateries; and (6) competition.

We reject this argument.

Simplot raised the same argument before the district court in its motion to amend the findings and judgment. In rejecting the argument, the district court stated: "Throughout the trial, [Eateries and Fiesta] argued that [Simplot's]

-19-

wrongdoing was the sole cause of [Eateries' and Fiesta's] harm, while [Simplot] attempted to attribute some portion of the harm to other factors." The court explained it had "consider[ed] and weigh[ed] the evidence presented by the parties [and] agreed with [Eateries' and Fiesta's] position." The district court also criticized Simplot's experts in its decision, finding they "failed to perform the work necessary to provide a solid foundation for the calculations they offered."

While Simplot touts the allegedly "undisputed" negative impact of factors other than the salmonella contamination on Eateries' value, we remind Simplot that an Eateries' expert contradicted its assertions that market forces significantly affected restaurant stock prices. Eateries' expert, Mr. Payne, analyzed the stock price of several companies similar to Eateries. He testified that, while some companies' stock value went up and other companies' stock value went down, their market multiples remained constant. Thus, Mr. Payne concluded any decline in the stock price of a company was "not because the industry [was] falling apart or the industry [was] so much out of favor, [it was] because of company-specific reasons." Given this testimony, we cannot say the district court erred in rejecting Simplot's experts' testimony about general market effects on the Eateries stock price. *See King Res. Stockholders' Protective Comm. v. Baer (In re King Res. Co.)*, 651 F.2d 1326, 1337 (10th Cir. 1980); *see also* Fed. R. Civ. P. 52(a).

Of course, Simplot also argues Eateries stock price decline was attributable to company-specific factors other than the salmonella contamination. Primarily, Simplot claims losses suffered by Eateries' restaurants not affected by the salmonella contamination contributed to the stock price decline. One of Simplot's experts, Mr. Wilsey, testified that in the year following the salmonella contamination, the Garcia's restaurants enjoyed a profit while other Eateries' restaurants suffered a loss. The record reveals questions as to the reliability of this testimony. Mr. Wilsey admitted he based his opinion on accounting records that may not have allocated many of Garcia's expenses to Garcia's. Another witness testified it was important to allocate expenses before comparing profits and losses because "[i]f you don't have the allocations in, you don't have a true operating profit." Following the salmonella contamination, the Garcia's restaurants launched an expensive marketing campaign to mitigate the harm the contamination caused. Leaving such a large expense unallocated would distort whatever profits Garcia's may have had, if any. With the accuracy of the underlying numbers in question, it was not error for the district court to discount Mr. Wilsey's testimony in its entirety.[6]

---

[6] Relying solely on Mr. Wilsey's expert opinion, Simplot also blames the Eateries stock price decline on Eateries' announcement of its poor earnings in the quarter before the salmonella contamination, Eateries stock repurchase, and competition. Given the previously discussed problems with Mr. Wilsey's testimony, we cannot conclude it was error for the district court to reject his

For these reasons, we conclude the district court did not err in failing to attribute part of Eateries' decline in value to factors other than the salmonella contamination.  There was sufficient evidence for the district court to conclude Eateries' decline in value was caused by the salmonella contamination.  We affirm the district court's award of diminution in value damages.

## IV.    Insurance Costs

Lastly, Simplot argues the district court impermissibly allowed a double recovery by awarding damages for increased insurance costs in addition to diminution in value damages.  Essentially, Simplot contends the diminution in value damages encompass the anticipated future cost of insurance.  According to Simplot, "[b]usiness valuation, however performed, is a measure of the anticipated profits or cash flows of the business ....  The anticipated profits are, of course, dependent upon comparing revenues with costs."  Consequently, Simplot claims "[t]he award of insurance is a double recovery as a matter of law."  We agree.

testimony in its entirety.  However, these arguments suffer from their own infirmities as well.  For example, there was testimony Garcia's sales were growing prior to the contamination, but turned negative after the incident, there was testimony the previous owner of the repurchased stock would not have sold the stock but for the salmonella contamination, and Mr. Payne testified his damage calculations (using values other than the publicly traded stock price) excluded any damage due to competition.  Therefore, we reject Simplot's argument.

-22-

Simplot raised this argument before the district court in its motion to amend. The district court rejected the argument. It reasoned:

> The award for diminution in value reflects the damage in the company's overall value, while the award for increased insurance premiums reflects compensation for a specific out-of-pocket expense caused by the [Simplot's] wrongdoing. An award for this expense is easily measured, it is separable from other costs and was clearly delineated by the evidence. Thus, it is a permissible award in addition to the diminution in value.

The court also stated that "[b]ased on the evidence offered at trial, the Court finds the insurance cost was not a factor in altering [Eateries' value]." Thus, the court concluded awarding increased insurance costs was not an impermissible double recovery. On appeal, Eateries' and Fiesta's arguments in support of the increased insurance cost award closely tracks the district court's reasoning.

In considering this issue, we note the purpose of damages in this case is to put "the aggrieved party ... in as good a position as if the other party had fully performed." Okla. Stat. Ann. tit. 12A, § 1-106 (West 1963). *See also* Okla Stat. Ann. tit. 12A §§ 2-714, 2-715 (West 1963). Oklahoma law does not generally allow a party to recover more "than the maximum recoverable loss that the party has sustained," *i.e.*, a party is not entitled to double recovery. *Black's Law Dictionary* 1280 (7th ed. 1999). *See Houck v. Hold Oil Corp.*, 867 P.2d 451, 461 (Okla. 1993). Eateries and Fiesta do not argue a double recovery would be

-23-

appropriate in this case. We review whether a damage award is in fact a double recovery under a clearly erroneous standard. *See United Phosphorus, Ltd. v. Midland Fumigant, Inc.*, 205 F.3d 1219, 1235-36 (10th Cir. 2000.)

In order to determine whether the district court's award amounts to a double recovery, it is necessary to understand what diminution in value damages encompasses. A court calculates diminution in value damages by comparing the fair market value of a company before a breach with the fair market value of the company after the breach. *See Protectors Ins.,* 132 F.3d at 615-18; *Mattingly*, 835 F.2d at 1559; *see also Black's Law Dictionary* 469 (7th ed. 1999) (defining "diminution-in-value method"). As previously noted, fair market value is "[t]he price that a seller is willing to accept and a buyer is willing to pay on the open market and in an arm's length transaction." Black's Law Dictionary at 1549; *see also Rhodes,* 143 F.3d at 1373 n.4. Market value "is said to be the present value of a projected profit stream." *R.E.B., Inc. v. Ralston Purina Co.*, 525 F.2d 749, 754-55 (10th Cir. 1975). Therefore, fair market value "*necessarily* incorporate[s] expected future profits." *So. Colo. MRI*, 166 F.3d at 1100 (emphasis added); *see also Protectors Ins.*, 132 F.3d at 616. Future profit, in turn, is the difference between expected revenue and expenses. *See Black's Law Dictionary* 1226 (7th ed. 1999). Fair market value, therefore, incorporates expected earnings and expenses.

-24-

*See Protectors Ins.*, 132 F.3d at 616 (stating "[t]he prospect of future earnings is considered in arriving at the fair market value of a given business").

Because fair market value, by definition, includes expected earnings and expenses, courts have generally held a plaintiff may not recover diminution in value damages and lost profits. *See id.* at 616-18; *Ralston Purina*, 525 F.2d at 753-54.[7] *Cf. Houck*, 867 P.2d at 460-61 (stating it would be duplicative to allow damages for loss of use and diminution in value damages for the same piece of land). The same principle logically precludes a plaintiff from recovering

---

[7] *See also Herrington v. County of Sonoma*, 834 F.2d 1488, 1506 (9th Cir. 1987) (holding plaintiffs could not "obtain compensation for both lost value and lost profit")*; Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 508 (4th Cir. 1986) ("[T]he two methods of calculation – present value of all future earning or market value of the business – are simply alternative methods of measuring the extent of the same injury. That is why courts allow a plaintiff to recover either the present value of lost future earnings or the present market value of the lost business, but not both."); *Am. Anodco, Inc. v. Reynolds Metals* Co., 743 F.2d 417, 424 (6th Cir. 1984) ("Where the loss of profits and loss of value are intertwined, as they are here, and the loss of value is based on loss of future profits, to allow both would be to permit a double recovery."); *Malley-Duff & Assocs. v. Crown Life Ins. Co.,* 734 F.2d 133, 148 (3rd Cir. 1984) ("Generally, when the loss of business is alleged to be caused by the wrongful acts of another, damages are measured by one of two alternative methods: (1) the going concern value; or (2) lost future profits."); *Arnott v. Am. Oil Co.*, 609 F.2d 873, 887 (8th Cir. 1979) (stating "going concern value and lost future profits are each viable alternative measures of antitrust damages"); *Lehrman v. Gulf Oil Corp.*, 500 F.2d 659, 664 n.14 (5th Cir. 1974) ("We, of course, realize that because future profits potential is a principal element of a firms' going concern value an award should not include both.").

diminution in value damages for a business and increased future expenses for the same business.

Here, the district court calculated Eateries' diminution in value by comparing Eateries' fair market value before the salmonella contamination with its fair market value after the contamination. The court found the $9.00 Halpern Denny offer represented Eateries' pre-contamination fair market value. In making its offer, Halpern Denny considered historical and future profitability. Thus, Eateries' pre-contamination fair market value incorporated expectations of future earnings and expenses.

The same is true for Eateries' post-contamination fair market value. The district court found Eateries' post-contamination fair market value was $6.92. The court explained that the fact "some value remained accounts for the market's assumption that [Eateries and Fiesta] will recover and earn profits in the future." Consistent with this explanation, the record shows Eateries' expected future profits were incorporated in its post-contamination fair market value. For example, a Halpern Denny partner testified Eateries' fair market value after the contamination was less than $9.00 because its future profits were more uncertain. Because the post-contamination fair market value included future profits, it also

incorporated the components of future profit – future earnings and future expenses.

In short, the fair market value of Eateries before and after the salmonella contamination included future expenses. Adding another future expense to the damage total in the form of increased insurance costs results in a double recovery.

Eateries and Fiesta nevertheless argue they are entitled to damages for Eateries' diminution in value and increased insurance costs because they suffered two independent harms. *Cf. Protectors Ins.*, 132 F.3d at 618. Rather than directing us to testimony or exhibits presented to the district court,[8] they direct us to the district court's finding that "[a]n award for [insurance] expense[s] is easily measured, it is separable from other costs and was clearly delineated by the evidence." We agree with the district court's findings that Eateries' insurance cost

_____

[8] Eateries and Fiesta do assert, "even [Simplot's] expert [Mr.] Wilsey said that Eateries should be compensated for the loss of profits *and* certain expenses, including the insurance loss." (Emphasis in original.) Mr. Wilsey did not opine Eateries should be compensated for its lost profits and insurance costs. He suggested the court award damages for the lost profits only *at the Garcia's restaurant locations directly owned by Fiesta*, as well as the increased insurance costs for which Eateries was responsible. Because Eateries paid the increased insurance costs itself, the insurance cost was not included as a Garcia's expense and, therefore, it was not a factor in the Garcia's profits.

increased and that the amount of the increase was easily measured.[9]  However, the concrete nature of the insurance cost evidence only strengthens our conclusion that the award of increased insurance costs was duplicative.  In its findings describing the post-contamination fair market value, the district court specifically found the market had sufficient time "to react to the incident and determine the future recovery of [Eateries and Fiesta]."  Given this finding, the market should have been able to account for increased insurance costs so "easily measured."  Furthermore, although we have combed the record, we find no evidence suggesting future expenses, such as insurance, were not included in Eateries' fair market value.  And, as discussed above, there is plenty of evidence suggesting the award of increased insurance costs is duplicative.  For these reasons, we reverse the district court's award of increased insurance costs.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** in part and **REVERSE** in part.  We **REMAND** the case to the district court for entry of judgment in accordance with this opinion.

---

[9] Simplot also faults the district court for failing to "make findings regarding ... undisputed factors [other than the salmonella contamination] which increased Eateries' insurance premiums."  We need not address this argument because we conclude the award of increased insurance premiums is duplicative.

02-6060, 02-6063, Eateries, Inc. v. J.R. Simplot Co.
**KELLY**, Circuit Judge, concurring in part and dissenting in part.

I concur in the court's opinion reversing the district court's judgment insofar as it awards insurance costs in addition to diminution in value damages. I dissent from the court's affirming the judgment awarding $8,200,607.40 in diminution in value damages. In my view, such a large award is clearly erroneous for three reasons.

First, the district court's diminution in value award is close to what the damages would have been if every Phoenix-area Garcia's restaurant had been put out of business. At the pertinent time, Eateries (1) owned and operated 48 Garfield's restaurants and two Pepperoni Grill restaurants, and (2) owned 100% of the stock of Fiesta Restaurants, Inc., a corporation that owned (a) five Phoenix-area Garcia's restaurants, (b) a Carlos Murphy's restaurant, and (c) an additional seven Garcia's restaurants outside of Arizona. Aplt. App. 173-75, 182, 184, 205. Seven months before the incident, Fiesta had purchased a group of restaurants, including the Garcia's chain, for a net price of approximately $4.6 million. Aplt. App. 175-76; Aplee. Supp. App. at 245, 274-75. Eateries' own subjective estimate of the value of the five Phoenix-based Garcia's restaurants was 6.6 times *budgeted* cash flow or approximately $8.46 million. Aplt. App. 422; see also Aplee. Supp. App. at 285 (company CEO suggesting a valuation multiple of 6.5 times budgeted cash flow).

Second, the district court determined that 100% of the diminution in value

of the Eateries stock was attributable to the incident involving the Phoenix-based Garcia's restaurants. By December 1998, Eateries owned and operated 64 restaurants; 14 had the Garcia's name; with seven of those in Arizona, and five in the Phoenix area. However Eateries allocates its corporate expenses between its restaurants, the bulk of its revenues and earnings come from its non-Phoenix based Garcia's restaurants, primarily Garfield's. Likewise, the vast majority of the company's productive assets are elsewhere. The company's internal corporate, as well as its public, documents suggest a variety of reasons why its stock price might decline, including increased competition, Garfield's declining same store sales in the third quarter of 1998, and a net loss for 1999 ($38,000) due to higher expenses, as compared with modest net income in 1998 ($1,183,000). Aplt. App. 320, 353, 369.

Moreover, even Eateries' expert acknowledged that other factors such as competition would affect its stock price. Aplee. App. at 434 ("The price of stock is going to be affected by a number of things including the amount of debt employed in the company, the company's earnings. There's a number of factors."), 457 (competition). Although the district court is free to reject contrary expert opinions, the failure to distinguish contrary evidence makes the district court's "all or nothing" causation finding suspect. Essentially, the district court implicitly found that this is an unusual publicly-traded company whose stock price

is unaffected by fundamental factors, market forces and earnings announcements.

Finally, the district court based its damage calculation on a value long before trial, February 1999. It seems to me that the Plaintiff has recovered the entire value of the five Phoenix-based Garcia's restaurants, yet it still owns them and those restaurants retain significant value. The purpose of damages is make one whole, not provide a huge windfall. See Beck v. N. Natural Gas Co., 170 F.3d 1018, 1024 (10th Cir. 1999); Redhouse v. Quality Ford Sales, Inc., 511 F.2d 230, 238 (10th Cir. 1975).