**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**November 7, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

CHAVEZ PROPERTIES-AIRPORT
PARKING ALBUQUERQUE, LP, a
Georgia limited partnership;
PARKING COMPANY OF
AMERICA, INC., a Georgia
corporation,

       Plaintiffs-Appellees/Cross-
       Appellants,

v.

JOHN LORENTZEN, individually;
PARK AND SHUTTLE, INC., a New
Mexico corporation; WES GOLDEN,
individually,

       Defendants-Appellants/Cross-
       Appellees.

Nos. 04-2338 and 04-2339
(D.C. No. CIV-02-0145-JP/ACT)
(D.N.M.)

---

CHAVEZ PROPERTIES-AIRPORT
PARKING ALBUQUERQUE, LP, a
Georgia limited partnership;
PARKING COMPANY OF
AMERICA, INC., a Georgia
corporation,

       Plaintiffs-Appellants,

v.

JOHN LORENTZEN, individually;
PARK AND SHUTTLE, INC., a New
Mexico corporation; WES GOLDEN,
individually,

No. 05-2053
(D.C. No. CIV-02-0145-JP/ACT)
(D.N.M.)

Defendants-Appellees.

CHAVEZ PROPERTIES-AIRPORT
PARKING ALBUQUERQUE, LP, a
Georgia limited partnership;
PARKING COMPANY OF
AMERICA, INC., a Georgia
corporation,

      Plaintiffs-Appellees,

v.

JOHN LORENTZEN, individually;
PARK AND SHUTTLE, INC., a New
Mexico corporation; WES GOLDEN,
individually,

      Defendants-Appellants.

No. 05-2388
(D.C. No. CIV-02-0145-JP/ACT)
(D.N.M.)

**ORDER AND JUDGMENT** *

Before **LUCERO**, **BALDOCK**, and **HARTZ**, Circuit Judges.

This case arises from the failed union of two parking lot operations

providing parking services for the Albuquerque International Airport.  Plaintiff

Chavez Properties-Airport Parking Albuquerque, LP (CPAPA), owner and

    * This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel.  The court
generally disfavors the citation of orders and judgments; nevertheless, an order
and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

operator of Airport Fast Park, and Defendant John Lorentzen, owner and operator of Defendant Park and Shuttle, Inc. (PSI), entered into a Joint Venture Agreement joining their two parking lots. In turn, the Joint Venture entered into a contract with Plaintiff Parking Company of America (PCA) to manage the Joint Venture parking lot. For a host of reasons, the deal fell through and the parties filed numerous claims against one another. After a bench trial, the district court found for Plaintiffs but awarded only nominal damages. The district court taxed Plaintiffs' costs on Defendants but refused to award attorney fees. Defendants appeal the district court's judgment as well as the award of costs. Plaintiffs cross-appeal the district court's damage award and denial of attorney fees. We have jurisdiction pursuant to 28 U.S.C. § 1291. We apply New Mexico law in this diversity action, affirming in part and remanding in part for additional findings of fact and conclusions of law.

I.

On January 1, 2000, CPAPA and Lorentzen verbally entered into a Joint Venture Agreement, the primary purpose of which was to consolidate expenses thereby increasing the profitability of their parking lots. The Joint Venture Agreement designated Manual Chavez, Jr. and Robert Chavez, part owners of CPAPA, and Lorentzen as managers of the Joint Venture. The agreement required the managers to unanimously agree to all management decisions, except those delegated to the management company designated in a separate agreement.

3

The agreement provided the parties split profits with CPAPA receiving 57% and PSI receiving 43%. The parties based this division of profits on the number of parking spaces each contributed to the Joint Venture parking lot.

To avoid daily management hassles, the joint venturers entered into a Parking Management Agreement with PCA, an entity of CPAPA, to manage the combined properties.[1] The Parking Management Agreement provided that PCA would manage the combined properties for the benefit of the Joint Venture partners. Defendant Wes Golden, PCA's employee, served as the parking operations site manager for the Joint Venture parking lot until December 2001 when PCA decided to remove him from site operations manager and transfer him to the marketing manager position. The Parking Management Agreement specified the parking manager's duties including operation of the lot, paying all expenses, collecting all revenue, providing financial reports, and making monthly profit distributions to the Joint Venture partners. Testimony at trial made clear PCA's function was to manage the day to day activities of the lot while the Joint Venture managers provided high level management.

Almost from the beginning of the Joint Venture, Lorentzen began to express dissatisfaction with the Joint Venture Agreement and the Parking

---

[1] Notably, the parties did not sign the Joint Venture Agreement or the Parking Management Agreement until March 1, 2001. Despite the delay, the parties acknowledge both agreements became effective on January 1, 2000. Additionally, the parties agree both contracts extended for a period of ten years.

Management Agreement. Within the first few months of the Joint Venture, Lorentzen sent letters to Robert Chavez expressing his discontent with certain items billed to the Joint Venture, complaining about PCA's management decisions, and requesting management fees for himself or a more favorable ownership split. A complete breakdown of the relationship began in late 2001 when Lorentzen wrote a series of letters objecting to certain charges to the Joint Venture and objecting to PCA's decision to replace Golden as the site manager. Lorentzen threatened to terminate the agreements if Robert Chavez and PCA did not comply with his demands.

In early January 2002, Lorentzen put the proverbial nail in the coffin when he removed PCA's credit card machines from the Joint Venture lot, took PCA's machines to his home, and installed his own credit card machines, thus diverting over $70,000 of Joint Venture funds to an account exclusively under his control. Lorentzen's actions prompted Robert Chavez and Tim Chavez, Senior Operations Manager for PCA, to travel to Albuquerque in attempt to rectify the situation. Robert Chavez and Lorentzen spent several days trying to work out their differences. During the course of their meetings, Lorentzen demanded modification of the Joint Venture Agreement and the Parking Management Agreement. Specifically, Lorentzen demanded Southwest Realty, which he owned and operated, be substituted for PCA as the manager of the Joint Venture. He also demanded a 50/50 profit split and demanded Wes Golden remain the site

5

operations manager or that PCA buy him out at three times his annual salary.

Needless to say, Robert Chavez did not accept the proposed modifications.

On January 25, 2002, after two days of unsuccessful negotiations with Lorentzen, Robert Chavez, along with other PCA representatives attempted to remove the credit card machines Lorentzen installed and reinstall PCA's machines. Golden, with the assistance of others, prevented re-installation of PCA's machines. Golden called the police and had Chavez and the PCA representatives escorted off the property. PCA representatives were not allowed on the property until February 11, 2002, when PCA and CPAPA received a temporary restraining order (TRO) allowing them to take back control of the property and resume management of the Joint Venture parking lot.

After PCA regained management control, they discovered Golden removed several items during their absence—namely computers containing PCA's proprietary information including billing information, frequent parker information, and contract parker information.[2] Additionally, PCA discovered Lorentzen entered into several unauthorized contracts on behalf of the Joint Venture. Finally, the testimony at trial showed that even after the district court entered the TRO, Lorentzen and Golden remained on the property, reeking havoc

---

[2] Although PCA fired Golden the day he called police and had its representatives escorted off the property, he remained in control of the parking lot operation due to his relationship with Lorentzen. According to the testimony at trial, he officially began working for Lorentzen the day PCA fired him.

6

among PCA employees. In particular, Golden and Lorentzen continued to give commands to PCA employees resulting in great confusion among the employees as to who was in charge. Several witnesses at trial described the atmosphere as very "tense."

Also of particular importance to this appeal, after PCA informed Golden he was being removed as operations manager in December of 2001, he entered into a contract on behalf of PCA with Airport Shuttle, a company owned by Lorentzen. According to the contract, PCA agreed to provide eighteen parking spaces on the Joint Venture lot for Airport Shuttle's use. At the time Golden signed the contract, PCA provided contract parking at the Joint Venture lot for $50 per month. But, the contract Golden executed charged Airport Shuttle only $20 per month per space. Additionally, the contract only provided that Airport Shuttle would occupy eighteen spaces when in fact, it occupied fifty spaces. PCA never received payment for Airport Shuttle's use of the fifty spaces. The contract was never discussed with anyone at PCA as required by its policy, and several days after he was fired from PCA in January of 2001, Golden went to work for Lorentzen.

CPAPA and PCA brought suit against Lorentzen, Golden and PSI claiming breach of contract; conspiracy to divest funds, assets, and customers; and breach of fiduciary duty. Defendants filed a separate suit (later consolidated with the initial lawsuit) claiming accounting (claims of waste and mismanagement), actual

7

or constructive fraud and conspiracy to defraud, tortious interference with beneficial business relations, breach of fiduciary duty, conversion of corporate funds and opportunities, damage to credit reputation, and attorney fees and costs. In May of 2002, after the TRO became effective but before trial, the court assigned an arbiter to the case. The arbiter functioned to keep the business operating in an orderly fashion pending trial. If either party disagreed with a ruling issued by the arbiter, it had the option of presenting the issue to the district court. Use of the arbiter became unnecessary when the parties agreed to terminate the Joint Venture and the Parking Management Agreement effective December 1, 2003. Thereafter, the parties separated the Joint Venture lot and resumed running their separate businesses.

The case proceeded to a bench trial in November 2003. After three days of testimony, the court delayed the trial because Plaintiffs' counsel became ill. The trial resumed for an additional eight days in March 2004. At the conclusion of the trial, the district court issued a written order finding in favor of Plaintiffs on their claims of breach of fiduciary duty and breach of contract and against Defendants on their claims. In particular, the court found Defendant Golden breached his fiduciary duty to his employer PCA. The court also found Lorentzen and PSI breached their fiduciary duty to the Joint Venture, and breached the Joint Venture Agreement and the Parking Management Agreement. The court further found Golden, although an employee of PCA, joined forces with Lorentzen in

8

effort to terminate or modify the Joint Venture. Despite Defendants' transgressions, the court refused to award Plaintiffs damages, save for $1 in nominal damages. The court entered two additional orders, one taxing Plaintiffs' costs against Defendants, and the other denying Plaintiffs' motion for attorney fees.

These cross-appeals followed. In an appeal from a bench trial, we review the district court's legal conclusions de novo, and its factual findings for clear error. We will reverse only if the district court's findings are without factual support in the record or if, after reviewing all the evidence, we are left with a definite and firm conviction that a mistake has been made. See Keys Youth Servs., Inc. v. City of Olathe, 248 F.3d 1267, 1274 (10th Cir. 2001).

II.

Defendants challenge several of the district court's findings on appeal. Specifically, Defendants argue the district court erred in finding: 1) Plaintiffs did not breach their fiduciary duties to Defendants; 2) Plaintiffs did not tortiously interfere with Defendants' beneficial business relationships; 3) Defendants are not entitled to an accounting; 4) Defendants ratified Plaintiffs' alleged misconduct prior to March 2001; 5) Golden conspired with Lorentzen to breach the contracts; 6) Defendants are not entitled to damages, costs and legal fees; and 7) Plaintiffs did not commit a prima facie tort. In a separate appeal, Defendants claim the district court erred in awarding Plaintiffs $19,980.66 in costs.

9

A.

Defendants first argue the district court erred in determining Plaintiffs did not breach their fiduciary duties to Defendants. Like partners in a partnership, a fiduciary relationship exists between parties to a joint venture. Lightsey v. Marshall, 992 P.2d 904, 908 (N.M. App. 1999). This duty requires joint venturers to "deal honestly and fairly with each other in accounting for profits and losses of the joint venture." Id. Defendants claim Plaintiffs breached this duty in several ways including: 1) assessing a portion of the cost of the Hummingbird computer software package to the Joint Venture; 2) assessing Airport Fast Park's van rental expense to the Joint Venture; 3) assessing losses from the Hyatt Regency Tamaya contract to the Joint Venture; 4) refusing to provide certain financial documents and reports; 5) favoring Airport Fast Park vehicles over PSI's vehicles for maintenance and repair; 6) failing to pay vendors; 7) overpaying for insurance coverage; 8) violating the arbiter's rulings; 8) failing to establish an operating budget; and 9) general mismanagement. The district court disposed of Defendants' complaints, finding they involved management decisions specifically appointed to PCA in the Parking Management Agreement. Thus, according to the district court, the decisions, good or bad, did not amount to breaches of fiduciary duty. We agree with the district court's assessment that most of Defendants' complaints involved management decisions assigned to PCA pursuant to the management agreement. For instance, PCA's decision to purchase additional insurance, its billing practices, the

10

maintenance and repair schedule for the vans, dissemination of financial statements and budgeting were all management issues entrusted to PCA.[3]

Defendants' other claims also do not amount to breaches of fiduciary duty. Lorentzen's complaints regarding the Joint Venture's payment for a portion of the Hummingbird software installed at PCA are not actionable as the evidence presented at trial showed PCA credited the Joint Venture with the cost of the software after Lorentzen objected. Additionally, attributing the lease expense for Airport Fast Park's vans to the Joint Venture was also not a breach of fiduciary duty. The record shows Lorentzen knew at the time he entered into the agreement the lease expense was part of the Airport Fast Park's expenses absorbed into the Joint Venture. The expense was fully disclosed in the financial disclosure documents Lorentzen received during discussions leading up to the Joint Venture. Despite his knowledge of this expense, he entered into the Joint Venture verbally and later formalized the documents in March of 2001. We can hardly say charging the Joint Venture for an expense Defendant was aware of prior to forming the Joint Venture was a breach of

---

[3]Defendants relied on Plaintiffs' alleged failure to produce certain financial documents to support its claim for accounting. In particular, Defendant Lorentzen complained he did not receive Daily Operating Reports (DORs). Because we agree with the district court that Plaintiffs' dissemination of financial reports involved management decisions and because the record indicates Lorentzen received all information needed to perform his function as a manager of the Joint Venture, we summarily find no error in the district court's decision refusing to order an accounting.

11

fiduciary duty.[4] Defendants' complaints regarding Plaintiffs' alleged failure to comply with the arbiter's rulings are also not supported by the record. The record shows that for each alleged instance of non-compliance, Plaintiffs appealed the arbiter's ruling to the district court, an action fully within their rights.

Finally, Defendants' allegation that Plaintiffs breached their fiduciary duty by charging the loss on the Tamaya contract to the Joint Venture is not a basis for reversing the district court's decision. A disputed issue of fact arose as to whether the Tamaya contract was part of the Joint Venture. The district court, serving as the fact finder, obviously believed Plaintiffs' witness Dale Losey when he testified the contract was a part of the Joint Venture and, therefore, any loss or profit was attributable to the Joint Venture. The district court's conclusion certainly is not unreasonable in light of the fact both Lorentzen and Golden signed the contract, an act that bound the Joint Venture to the terms of the contract. See Keys Youth Servs., 248 F.3d at 1274 ("[W]e will reverse the district court's finding only if it is without factual support in the record . . . .") (internal quotation marks omitted). In sum, we find no error in the district court's conclusion that Plaintiffs' conduct did not amount to a breach of the fiduciary duty.

B.

---

[4] Defendants' argument that the district court misapplied the doctrine of ratification has no application in this case. The district court found that a charge to the Joint Venture Defendant knew about even before the inception of the Joint Venture is not evidence of Plaintiffs alleged breach of fiduciary duty. Prior knowledge does not implicate the doctrine of ratification.

12

Defendants next argue the district court erred in finding insufficient evidence to support their claim of tortious interference with beneficial business relations. The elements of tortious interference are (1) interference in a relationship or transaction; (2) with an improper motive or by improper means; or (3) without justification or privilege. Quintana v. First Interstate Bank, 737 P.2d 896, 898 (N.M. App. 1987). Defendants claim PCA failed to pay bills to various vendors in attempt to erode Defendants' relationship with those vendors. Although Plaintiffs admittedly had some problems with their billing practices, we find nothing in the record (nor does Defendant point us to any evidence) indicating PCA's delay in paying bills was motivated by some intent to interfere with Defendants' business relationships. See M&M Tools v. Milchem, Inc., 612 P.2d 241, 246 (N.M. App. 1980) (noting a defendant acts with an "improper motive" for purposes of proving a interference with business relations claim when the defendant's sole purpose is to harm the plaintiff). Accordingly, we conclude the district court did not err in finding Defendants failed to show Plaintiffs tortiously interfered with their business relations.

C.

Finally, Defendants argue the district court should have considered their claim that Plaintiffs committed a prima facie tort. The district court summarily dismissed Defendants' prima facie tort claim along with several others in its written order. The elements of prima facie tort are 1) an intentional and lawful act, 2) an intent to injure the plaintiff, 3) injury to the plaintiff as a result of the intentional act, and 4) the

13

absence of justification for the injurious act.  Schmitz v. Smentowski, 785 P.2d 726,

734-35 (N.M. 1990).  "Prima facie tort is not intended to provide a remedy for every

intentionally caused harm, rather, it is a remedy for acts committed with intent to

injure the plaintiff and without justification."  Kitchell v. Public Serv. Co., 972 P.2d

344, 348 (N.M. 1998).  Analyzing liability requires balancing the intent to injure

Defendants against both the justification for the injurious act and the severity of the

injury.  Id.  But, if a party claiming a prima facie tort presents no evidence of an

intent to injure, as is the case here, the court need not conduct the balancing test.  Id.

Defendants brief does not point to a shred of evidence showing Plaintiffs' acted with

the intent to injure Defendants.  Defendants simply conclude in the course of three

sentences that the district court should have considered whether Plaintiff committed

a prima facie tort because they lost on their other claims.  Such a bald assertion is

insufficient for consideration on appeal.  Alder v. Wal-Mart, 144 F.3d 664, 679 (10th

Cir. 1998).  Accordingly, Defendants waived this argument.[5]

## D.

Golden also appeals the district court's conclusion he breached his fiduciary

duty when he and Lorentzen joined forces to terminate or modify the Joint Venture

Agreement.  Golden argues he did not owe Plaintiffs a fiduciary duty, and

---

[5] Because we find the district court properly determined Defendants failed
to prove any of its claims, we need not address Defendants assertions the district
court erred in rejecting its experts calculation of damages, failing to assess
punitive damages against Plaintiffs, and failing to award Defendants their court
costs and legal fees.

14

insufficient evidence supports the district court's finding he entered into a conspiracy with Defendant Lorentzen to destroy the Joint Venture.[6] We are not persuaded. First, the district court found Golden owed a fiduciary duty to his employer, PCA and/or the Joint Venture, by virtue of being an employee. Golden does not challenge this finding on appeal. He instead argues he did not owe a fiduciary duty because he did not sign the Joint Venture Agreement or the Parking Management Agreement. Because Golden fails to cite any case law or adequately explain how the district court erred in its ruling, we find Golden waived this argument on appeal. See Alder, 144 F.3d at 679 (arguments inadequately briefed in the opening brief are waived).

Second, the district court's order adequately lays out the evidence showing Golden and Lorentzen acted together to terminate or modify the Joint Venture. Notably, Golden allowed Lorentzen to sign contracts binding the Joint Venture for which Lorentzen had no authority, and he did not prevent Lorentzen from removing credit card machines installed by PCA, thus diverting Joint Venture funds into Lorentzen's own account. Also, Golden physically prevented PCA employees from removing Lorentzen's credit card machines and re-installing PCA's machines. And, as the district court recognized, Golden was involved in "pirating the hard drives and computer information maintained by PCA in the management of the joint venture,

---

[6] We note, contrary to Defendants' contentions in its brief, the district court did not find Golden and Lorentzen entered into a "conspiracy" as the term is understood in the technical legal sense. Instead, the court found Golden and Lorentzen worked together to destroy the Joint Venture and in doing so they each breached their respective fiduciary duties.

15

thus depriving PCA of its use while the parties commenced over two years of litigation." In apparent exchange for Golden's loyalty, Lorentzen demanded PCA continue to employ Golden as site operations manager after it decided to demote him to marketing manager. Or, in the alternative, Lorentzen demanded PCA buy out Golden's contract at three times his yearly salary. Such acts support the district court's finding that Lorentzen and Golden worked together to either modify or terminate the Joint Venture Agreement and as a result, Golden breached his fiduciary duties. Accordingly, we find no error in the district court's conclusions.

E.

Defendants filed a separate appeal challenging the district court's award of costs to Plaintiffs. The district court's order, dated November 10, 2005, taxed Defendants with costs in the amount of $19,980.66. Defendants complain Plaintiffs are not "prevailing parties" and thus the district court should not have awarded them costs. Additionally, Defendants complain the district court should not have awarded Plaintiffs costs for the first three days of trial transcripts and costs for the court appointed appraiser's fees. An award of costs under 28 U.S.C. § 1920 and Fed. R. Civ. P. 54(d)(1) rests in the sound discretion of the trial court. Allison v. Bank One-Denver, 289 F.3d 1223, 1248 (10th Cir. 2002). "To hold that the district court abused its discretion, [this court] must have a definite conviction that the [trial] court, upon weighing relevant factors, clearly erred in its judgment." Gordon v. U.S. Steel Corp., 724 F.2d 106, 108 (10th Cir. 1983).

16

Defendants argue Plaintiffs did not prevail because they received only $1 in damages and because the parties entered into a joint stipulation prior to trial resolving one of the more contentious claims. We are not convinced. First, for purposes of Rule 54(d)(1), "the litigant in whose favor judgment is rendered is the prevailing party . . . ." Barber v. T.D. Williamson, Inc., 254 F.3d 1223, 1234 (10th Cir. 2001) (citations and quotations omitted); see also Head v. Medford, 62 F.3d 351, 354 (11th Cir. 1995) ("Cases from this and other circuits consistently support shifting costs if the prevailing party obtains judgment on even a fraction of the claims advanced.") (internal quotations omitted).[7] In this case, the district court entered judgment in favor of Plaintiffs. That Plaintiffs failed to submit reliable evidence of damages, resulting in a nominal damage award, does not alter their prevailing party status for purpose of Rule 54(d)(1). Furthermore, Plaintiffs successfully defended themselves against all of Defendants' counterclaims, making them the prevailing party on all theories.[8]

---

[7]These cases suggest a more lenient standard for "prevailing party" status for purposes of awarding costs than those cases discussing "prevailing party" status for purposes of awarding attorney' fees. See, e.g., Gudenkauf v. Stauffer Communs., 158 F.3d 1074, 1076 (10th Cir. 1998). Accordingly, Defendants' reliance on cases discussing "prevailing party" status for purposes of attorney fees is unpersuasive.

[8] Defendants' argument that the parties resolved one of the major contentions before trial in a joint stipulation, thus robbing Plaintiffs of "prevailing party" status, is equally unavailing. The joint stipulation Defendants referred to called for the termination of the Joint Venture. Defendants contend the separation of the parking lots "took up the most energy and expense."

(continued...)

17

Defendants specifically object to the district court's award of costs for trial transcripts from the first three days of trial, and the fees for the court appointed appraiser. Trial began in November 2003. After three days of trial, Plaintiffs' attorney became quite ill and could not continue. The district court continued the trial until March 2004 when trial was completed after an additional eight days. The district court awarded Plaintiffs' costs for the entire trial transcript. Defendants contend the district court abused its discretion in awarding Plaintiffs the costs for the trial transcripts from the three days of trial in November because Defendants were not to blame for the delay. This may seem like a legitimate complaint but the fact is Plaintiffs were entitled to costs for the entire trial transcript whether transcribed in November or March. Pursuant to 28 U.S.C. § 1920(2), a prevailing party is entitled to recover "fees for the court reporter for all or any part of the stenographic transcript necessarily obtained for use in this case." The district court awarded the cost for the trial transcript on the basis the transcript was "obtained for Plaintiffs use in preparing for trial and to assist the attorneys and the Court in preparing findings of fact and conclusions of law." In addition to proposed findings of fact and conclusions of law, the district judge also requested written closing arguments and post-trial briefs at the close of trial. Because Plaintiffs used the trial transcript to

[8](...continued)
Defendants statement may be true as to pre-trial matters, but the costs which the district court imposed (i.e. trial transcripts, witness travel and subsistence costs, costs incurred by court appointed expert, and deposition expenses for those witnesses who testified at trial) were directly related to issues resolved at trial.

18

assist in preparing these items, the district court did not abuse its discretion in awarding costs for the entire transcript.

The court also did not abuse its discretion in taxing the costs of the court appointed appraiser to Defendants. Pursuant to 28 U.S.C. § 1920(6), the district court may tax as costs, "compensation of court appointed experts." Defendants argue Plaintiffs should not be awarded costs for the services of the appraiser because Defendants benefitted from the court's adoption of the appraisal report. Nothing in the statute requires the court to consider who benefitted from the court appointed experts findings and Defendants cite no authority for such an assertion. Accordingly, the district court's cost award will be upheld.

## III.

We next address Plaintiffs' claims on appeal. Plaintiffs challenge the district court's $1 damage award, the district court's apparent neglect of Plaintiffs' claim concerning the Airport Shuttle contract, and the district court's denial of their motion for attorney fees. We address each argument in turn.

## A.

We review the amount of a damage award for clear error and questions of law de novo. See, e.g., Dill v. City of Edmond, Okla., 155 F.3d 1193, 1209 (10th Cir. 1998). "The methodology a district court uses in calculating a damage award, such as determining the proper elements of the award or the proper scope of recovery, is a question of law." See Southern Co. MRI v. Med-Alliance, 166 F.3d 1094, 1100

(10th Cir. 1999); see also In re Air Crash Disaster Near Cerritos, Cal., on August 31, 1986, 982 F.2d 1271, 1275 (9th Cir. 1992) ("When a legal determination such as the proper elements of an award of damages is reviewed, a de novo standard is applied.").

In cases such as this, where profit is an inducement to making a contract, "loss of profits as a result of the breach is generally considered to be within the contemplation of the parties and recovery for lost profits will be allowed as damages if causation is proved with reasonable certainty." Camino Real Mobile Home Park Partnership v. Wolfe, 891 P.2d 1190, 1200 (N.M. 1995). The court considers certain factors including "the pre-existing or historic profits of an established business, together with other facts and circumstances" in arriving at an estimation of the lost profits resulting from the breach of contract. Ranchers Exploration & Dev. Corp. v. Miles, 696 P.2d 475, 477 (N.M. 1995). Where a party establishes a legal right to damages, the fact lost profits may not be computed with exact mathematical certainty does not prevent the plaintiff from recovering. Id. "Even though the amount of damages need not be proven with mathematical certainty, neither can it be based on surmise, conjecture or speculation." Camino Real, 891 P.2d at 1201.

At trial, Plaintiffs attempted to establish lost profits through the testimony of Martin and Robert Chavez, and Exhibit 271, which Robert prepared. Robert, with the assistance of Exhibit 271, testified to the amount of expense savings CPAPA lost as a result of the failure of the Joint Venture. Robert explained the actual average

20

monthly expenses of the Joint Venture were $117,027.54. He then subtracted that figure from the average monthly expenses prior to the Joint Venture, resulting in a difference of $23,276.88 in expense savings per month. Multiplied by twelve, the total annual expense saving amounted to $279,313.56. Robert then calculated CPAPA's percentage interest in the Joint Venture (57%) in the total annual expense savings, and came up with $159,151.73 as CPAPA's average yearly expense savings resulting from its involvement with the Joint Venture. Finally, Robert multiplied this figure by six, the number of years remaining in the Joint Venture, resulting in $954,910.38 in total lost expense savings.

Apparently alarmed when the district court made comments concerning the inadequacy of Robert's testimony, Plaintiffs called Martin Chavez to testify. Martin, who is the president of PCA and partial owner of CPAPA, testified as to the diminution in the value of CPAPA as a result of Defendants' breach. Like lost profits, damages measured by diminution of value flow "'from the disappointment of a special purpose for the subject matter of the contract'" when that subject matter is known to both parties. Id. at 1200 (quoting Wall v. Pate, 715 P.2d 449, 450 (N.M. 1986)). See also Eateries, Inc. v. J.R. Simplot Co., 346 F.3d 1225, 1236 (10th Cir. 2003) (noting damages may be measured by diminution in value when a party loses a business due to the wrongful act of another). Martin used the 1998 profit and loss statement from CPAPA and the profit and loss statements generated during the Joint Venture to make his calculations. He calculated the difference between the income

21

and expenses, both pre and post Joint Venture, and then applied a 9.5 percent capitalization rate to value the business prior to the Joint Venture and at the conclusion of the Joint Venture. Finally, Martin subtracted the pre and post Joint Venture values and concluded CPAPA suffered a significant loss resulting from the failure of the Joint Venture.

The district court awarded Plaintiffs $1 in damages, rejecting Plaintiffs' damage evidence as speculative and conjectural. The court found Robert's calculation flawed because it did not establish CPAPA's actual lost profits, but instead only focused on CPAPA's expenses before and during the Joint Venture. The court noted Robert Chavez "did not try to calculate the future profits of the company, nor did he determine the present value of the expense savings he calculated." Thus, the district court determined his testimony was merely "surmise, conjecture or speculation." The court also found Martin's attempt to show loss in value of the company was equally flawed. The court further found that if Martin attempted to show lost profits, he failed to establish the present value of such profits and failed to show what portion of those profits CPAPA would have realized while operating its business separately. We agree with the district court and find neither Robert nor Martin Chavez's testimony provided the trier of fact with an adequate basis upon which to calculate lost profits.

Plaintiffs argue on appeal the district court erred because it held Robert and Martin Chavez, who testified as laymen, to the same standard it would expert

22

economists. At the outset, we agree with the general proposition that lay persons, especially business owners, are qualified to testify regarding lost profits. Ranchers Exploration, 696 P.2d at 478. But, such witnesses are still required to present testimony which enables the trier of fact to properly calculate damages. Such was not the case here. In the case of Robert's testimony, he failed to even mention historical profits or estimate future profits in his lost profits calculation. A basic principle of accounting is that profits are determined only after operating expenses are deducted from income. Lost profits are, by their definition, the receipts or income one would receive after expenses are deducted. Here, Plaintiffs only presented evidence of expenses, not income. Without anything to compare them to, evidence of expenses are irrelevant. In calculating lost profits, evidence of gross profits alone has no evidentiary value and failure to present evidence of expenses is detrimental to the claim. See, e.g., Deaton, Inc. v. Aeroglide Corp. 657 P.2d 109, 114 (N.M. 1982) (plaintiff's failure to introduce evidence of expenses rendered its claim for lost profits speculative). We have no reason to assume the converse is not true—attempting to compute lost profits with evidence of expenses but no evidence of income lacks the evidentiary thrust necessary to prove one's claim for damages. Thus, we find the district court did not err in concluding Robert's failure to present evidence of CPAPA's profits was fatal to the lost profits calculation.

We also agree that Martin's testimony did not provide a sufficient basis upon which the district court could calculate damages. To the extent Martin attempted to

23

show diminution in value, he did not use the correct data. Such a showing required an assessment of CPAPA's fair market value immediately prior to the Joint Venture and its fair market value immediately following the termination of the Joint Venture. See generally Jones v. Lee, 971 P.2d 858, 862 (N.M. App. 1998); Eateries, Inc., 346 F.3d at 1236. Market value is "'the present value of a projected profit stream.'" Id. (quoting R.E.B., Inc. v. Ralston Purina Co., 525 F.2d 749, 754-55 (10th Cir. 1975)). Projecting a profit stream requires an analysis of future profits. Id. Future profits are calculated by taking the difference between expected revenue and expected expenses. Id. (citing Black's Law Dictionary 1226 (7th ed. 1999)). "Fair market value, therefore, incorporates expected earnings and expenses." Id. (citing Protectors Ins. Serv. v. United States Fid. & Guar. Co., 132 F.3d 612, 615 (10th Cir. 1998)).

In arriving at the pre-Joint Venture value, Martin used the 1998 profit and loss statement to calculate CPAPA's pre-Joint Venture expenses even though the 1999 figures were most relevant.[9] And, instead of using the pre-Joint Venture historical profits to calculate the pre-Joint Venture market value, he averaged the Joint Venture's profits over the course of the entire Joint Venture and then carved out CPAPA's percentage of the profits. Failure to use historical profits and failure to use the most relevant expense figures to calculate pre-Joint Venture market value

[9] CPAPA's argument that it used the 1998 expense figures because the parties used those figures during contract negotiations is unpersuasive. Calculation of diminution in value requires an evaluation of the company's value *immediately* prior to the contract, not the value of the company one year or more prior to the contract.

24

skewed his entire calculation. Martin applied a capitalization rate to these faulty numbers and then subtracted that figure from the capitalized post-Joint Venture value. Even assuming his post-Joint Venture value figures were correct and the capitalization rate Martin chose was correct, failure to accurately calculate the pre-Joint Venture value flawed the entire calculation. Accordingly, the district court correctly decided not to rely on these numbers to calculate damages.[10]

## B.

Next, we address Plaintiffs' claim that the district court failed to consider its claim regarding the Airport Shuttle contract. As noted above, on January 15, 2002, Golden executed a contract purportedly on behalf of the Joint Venture, providing parking spaces to Airport Shuttle, a company owned by Lorentzen.[11] The contract provided Airport Shuttle unlimited use of eighteen spaces on the Joint Venture lot at a deeply discounted rate of $20 per month. Not only were the rates significantly lower than the usual rate of $50 per month, the contract favored Airport Shuttle as it provided only Airport Shuttle could cancel the contract. The record reflects Golden executed the contract after PCA notified him he would not longer serve as

---

[10] To the extent Martin attempted to show lost profits by subtracting the 1998 expense figures from CPAPA's portion of the Joint Venture profits, and multiplying by six (the number of years remaining in the Joint Venture), his calculations were similarly faulty.

[11] Jack Henderson, Lorentzen's employee, executed the contract on behalf of Airport Shuttle. According to Henderson's testimony at trial, Lorentzen asked him to sign the contract for fear that if Lorentzen signed it himself a conflict of interest might arise.

25

operations manager for the Joint Venture, and that even if Golden continued to serve as operations manager, he had no authority to sign the contract on behalf of PCA without prior approval from corporate headquarters. Of further importance, Golden went to work for Lorentzen ten days after he signed the contract. Testimony at trial also revealed Airport Shuttle eventually used fifty spaces on the lot, instead of the eighteen space contemplated by the contract, and the Joint Venture never received payment for Airport Shuttle's use of the parking spaces. Despite this evidence in the record, the district court made no mention of Plaintiffs' claim in its written order.

CPAPA claims it was damaged by the unauthorized contract with Airport Shuttle in the amount of $32,775. This amount constitutes CPAPA's 57% of the $57,500, the amount Airport Shuttle should have paid the Joint Venture at the usual rate of $50 per month for fifty spaces during the term of the contract. The district court's failure to rule on this matter precludes meaningful appellate review. Ramey Constr. Co., Inc. v. Apache Tribe, 616 F.2d 464, 466-67 (10th Cir. 1980) (noting that F.R.C.P. 52(a)'s requirements that the trial judge "find facts specially and state separately its conclusions of law" serves to (1) engender care on the part of trial judges in ascertaining the facts; and (2) make possible meaningful appellate review). Accordingly, remand is required for the district court to make findings of facts and conclusions of the law regarding the Airport Shuttle contract.

C.

Finally, Plaintiffs claim the district court erred in refusing to impose attorney

fees against Defendants under paragraph 1.08 of the Joint Venture Agreement. That paragraph states:

> Unauthorized Acts. Either Party hereto acting or purporting to act for or on behalf of the other Party hereto in violation of the terms and provisions of this Agreement shall be acting without authority and the Party acting or purporting to act shall indemnify and hold the other Party harmless from and against any and all claims, loss, liability or expense, which might arise or result from any such act or acts, including, without limitation, all attorneys' fees and expenses actually incurred.

The determination of a contractual term is a question of law that this court reviews de novo. See Carland v. Metropolitan Life Ins. Co., 935 F.2d 1114, 1120 (10th Cir. 1991).

Reading the provision in the context of the Joint Venture Agreement we agree with the district court and find the provision only relates to liabilities to third parties created by the unauthorized conduct of one of the parties to the Joint Venture Agreement. The provision does not appear to set aside the "American Rule" at least as it applies to litigation between the parties to the Joint Venture Agreement. See McClain Co. v. Page & Wirtz Constr. Co., 694 P.2d 1349 (N.M. 1985) (New Mexico follows the "American Rule" in that each party bears the financial burden of litigating a civil claim, absent a statute or agreement to the contrary). Accordingly, the district court did not err when it denied Plaintiffs' application for attorney fees.

For the foregoing reasons, this matter is AFFIRMED in part and REMANDED

27

in part for the district court's consideration as stated herein.

Entered for the Court,


Bobby R. Baldock
Circuit Judge